In the Matter of the Extradition of Octavio **RODRIGUEZ ORTIZ**, a/k/a Oscar Rodriguez Ortiz, a/k/a El Tatu

**Fugitive from the Government of the United States of Mexico.**

No. 06 M 57.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 7, 2006.

Robert D. Seeder, Federal Defender Program, Chicago, Counsel for Defendant.

Patrick Nagle, Assistant United States Attorney, Chicago, Counsel for the United States.

## MEMORANDUM OPINION AND ORDER GRANTING CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT

MORTON DENLOW, United States Magistrate Judge.

The Government of the United Mexican States ("Mexico") has requested the extradition of Octavio Rodriguez Ortiz ("Ortiz" or "Defendant"), also known as Oscar Rodriguez Ortiz or El Tatu, pursuant to the Extradition Treaty between the United States and Mexico, dated May 4, 1978, 31 U.S.T. 5059, TIAS 9656 ("Treaty"). Ortiz is charged in the State of Aguascalientes, Mexico, with committing the crime of simple intentional homicide (voluntary manslaughter) against Jose de Jesus Garcia Ramos ("Garcia Ramos"). The Government of Mexico is seeking his extradition for trial on this offense and an order of commitment to the custody of the United

States Marshal pending final disposition of this matter by the Secretary of State.

On July 24, 2006, an extradition hearing was conducted by this Court. Ortiz contests his extradition solely on the issue of probable cause. The Court has carefully considered the exhibits introduced into evidence, the written submissions of the parties, and the fine arguments of counsel. The Court finds there is sufficient competent evidence to sustain a finding of probable cause and Ortiz should be extradited to Mexico in accordance with the Treaty. Ortiz is committed to the custody of the United States Marshal pending final disposition of this matter by the Secretary of State.

## I. THE EXTRADITION PROCESS

■ The process of extraditing a fugitive from the United States to Mexico is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181 et seq., and the extradition treaty between the United States and Mexico, 31 U.S.T. 5059. Pursuant to 18 U.S.C. § 3181, the provisions of the federal extradition statute apply during the existence of a valid extradition treaty. Under Article 1 of the Treaty, the United States and Mexico mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. 31 U.S.T. 5059.

The process begins with the discovery of a foreign fugitive within the territory of the United States. Under Article 11 of the Treaty, Mexico may then request the provisional arrest of the fugitive, and the United States must comply with a valid request. *Id.* The request must contain a description of the person sought, a description of his alleged crimes, a declaration of the existence of a warrant for his arrest, and an undertaking to submit a formal request for extradition. *Id.* If a formal request for extradition and the re-quired supporting documents are not filed within sixty days of the apprehension of the fugitive, the provisional arrest must be terminated. *Id.* However, this will not prejudice the extradition once the required documents have been submitted. *Id.* Likewise, 18 U.S.C. § 3184 authorizes a judicial officer to issue a warrant for the arrest for any fugitive whose extradition is requested, upon a sworn complaint charging the fugitive with committing an extraditable offense.

The second stage in the extradition process is the submission of a formal request for extradition. Article 10 of the Treaty lists the required contents of a formal request for extradition, and requires that it be submitted through diplomatic channels. 31 U.S.T. 5059. In addition to the formal request, supplementary documents must be provided. Among the documents required for a fugitive not yet convicted are a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there." *Id.* Article 10 further directs that these documents shall be received into evidence if they are certified by the principal consular officer of the United States in Mexico. *Id.* Likewise, the federal extradition statute provides that documentary evidence proffered by a foreign government requesting extradition will be admissible if it is certified to be properly authenticated by the principal consular officer of the United States in the requesting country. 18 U.S.C. § 3190; *see also In re Assarsson,* 635 F.2d 1237, 1245–46 (7th Cir.1980).

The next step in the extradition process is the extradition hearing conducted by a federal court in order to hear the evidence and determine whether that evidence is

"sufficient to sustain the charge under provisions of the proper treaty or convention." 18 U.S.C. § 3184. Article 3 of the Treaty states that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." 31 U.S.T. 5059.

Finally, where the judge determines that the evidence is sufficient to warrant extradition, he certifies this to be the case and forwards all the evidence taken before him to the Secretary of State. 18 U.S.C. § 3184. The judge also issues a warrant for the commitment of the fugitive until surrender to the foreign government can be made. *Id.* The final decision on whether or not to extradite the fugitive is reserved to the Secretary of State. 18 U.S.C. § 3186. Likewise, Article 14 of the Treaty provides that if extradition is granted, surrender shall then be made at such time and place as determined according to the laws of the requested country. 31 U.S.T. 5059.

## II. REQUEST FOR EXTRADITION OF ORTIZ

On February 28, 2006, the United States filed a complaint for extradition against Ortiz. The complaint seeks Ortiz's extradition to Mexico for voluntary manslaughter, in violation of Articles 96 and 105 Section II of the Penal Code of the State of Auguascalientes, Mexico. An initial appearance was held on March 2, 2006, and Ortiz was ordered detained.

On April 17, 2006, David Donahue, the Minister Counselor for Consular Affairs of the United States of America in Mexico, certified, under oath, certain documents, which were submitted by Mexico upon the application for Ortiz's extradition, as having been "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of the United Mexican States, as required by Title 18, United States Code, Section 3190." Gov. Ex. B.[1]

## III. PRELIMINARY FINDINGS

The Court finds the formal request for extradition and supporting documents are in compliance with the content requirements of Article 10 of the Treaty. The Court further finds the formal request for extradition and supporting documents were submitted within the time frame provided for in Article 11 of the Treaty. Finally, the Court finds the documents submitted were properly certified by the principal consular officer of the United States in Mexico. Therefore, the documents submitted are admissible for the purpose of this extradition proceeding, as per Article 10 of the Treaty and 18 U.S.C. § 3190.

## IV. EXTRADITION OF DEFENDANT TO MEXICO IS PROPER

■ The general purpose of an extradition hearing under 18 U.S.C. § 3184 is to provide a judicial determination that extradition is proper under the circumstances. A request for extradition will be granted if the following findings are made:

1. The judicial officer has jurisdiction to conduct an extradition proceeding,

---

1. The Government attached Exhibits A—G to its Memorandum in Support of Extradition. Such exhibits will be cited to as follows: Gov. Ex. ___. It also submitted Government Exhibit 1 at the July 24, 2006 hearing. Government Exhibit 1 contains Exhibits 1—21, which were provided by Mexico. The 21 exhibits provided by Mexico will be cited to as follows: Ex. ___. Defendant attached Exhibits A—E, which will be cited to as follows: Def. Ex. ___.

2. The Court has jurisdiction over the fugitive,

3. The person before the Court is the fugitive named in the request for extradition,

4. There is an extradition treaty in full force and effect,

5. The crimes for which surrender is requested are covered by that treaty, and

6. There is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought.

*Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.1981); *In re Extradition of Fulgencio Garcia,* 188 F.Supp.2d 921, 925 (N.D.Ill.2002).

## A. JURISDICTION OF THE JUDICIAL OFFICER

■ The statute governing extradition proceedings, 18 U.S.C. § 3184, authorizes a broad class of judicial officers to hear extradition cases. Federal magistrate judges are expressly authorized to hear and decide extradition cases if "authorized to do so by a court of the United States." 18 U.S.C. § 3184. In addition, the jurisdiction of federal magistrate judges in extradition proceedings has been upheld as being consistent with Article III of the Constitution. *Ward v. Rutherford,* 921 F.2d 286, 289 (D.C.Cir.1990). Ortiz does not contest this Court's jurisdiction over extradition proceedings. The Court has the requisite subject matter jurisdiction over this proceeding.

## B. JURISDICTION OF THE COURT OVER THE PERSON

■ The extradition statute further provides that jurisdiction will apply to any person found within the jurisdiction of the court. 18 U.S.C. § 3184. Ortiz was initially found, and is now in federal custody, within the jurisdiction of the Northern District of Illinois. Ortiz does not dispute this Court's jurisdiction over him. The Court has the requisite personal jurisdiction to make a determination on the extraditability of Ortiz pursuant to 18 U.S.C. § 3184.

## C. IDENTITY OF FUGITIVE

Ortiz has waived the right to an identity hearing and does not dispute that he is the Octavio Rodriguez Ortiz, also known as Oscar Rodriguez Ortiz or El Tatu, sought by Mexico. The Court finds that the defendant is the Octavio Rodriguez Ortiz, also known as Oscar Rodriguez Ortiz or El Tatu, named in the extradition request and supporting documents proffered by Mexico.

## D. EXISTENCE OF EXTRADITION TREATY

■ United States law limits extradition to cases in which a treaty is in force between the requesting country and the United States. 18 U.S.C. § 3181. *See also Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 8–9, 57 S.Ct. 100, 81 L.Ed. 5 (1936). The United States has submitted a declaration from the State Department in Washington, D.C., dated May 10, 2006, which verifies that the Extradition Treaty between the United States and Mexico, TIAS 9656, was signed on May 4, 1978, and is presently in full force and effect. Gov. Ex. E. Ortiz does not contest that an extradition treaty between the United States and Mexico is in full force and effect. The Court finds that there is a valid extradition treaty in full force and effect between the United States and Mexico.

## E. CRIMES UNDER THE TREATY

■ Pursuant to 18 U.S.C. § 3184, extradition will be considered where there is a sworn complaint charging the fugitive

with a crime provided for in the applicable extradition treaty. Article 2 of the Treaty provides that "[e]xtradition shall take place, subject to this Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." 31 U.S.T. 5059. In addition, Article 7 of the Treaty provides that extradition shall not be granted where the statute of limitations has run on the crime in either country. 31 U.S.T. 5059. In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States. *Cucuzzella v. Keliikoa,* 638 F.2d 105, 107 (9th Cir.1981). The Court will not simply look for common names, but will assess what charges would be forthcoming had the facts alleged occurred within a domestic jurisdiction. *Collins v. Loisel,* 259 U.S. 309, 312, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Messina v. United States,* 728 F.2d 77, 79 (2d Cir.1984).

■ Ortiz does not contest that the crimes for which he is charged are covered under the terms of the Treaty. The Court finds that the crime for which Ortiz was charged, Simple Intentional Homicide, was supported by sworn complaints and is covered under the terms of the Treaty.

## F. PROBABLE CAUSE TO EXTRADITE

Of the six findings that must be established before extradition can be ordered, Ortiz is only challenging the issue of probable cause. Specifically, Ortiz argues that the government has failed to present competent evidence to support a finding of probable cause for the charge of simple intentional homicide.

■ Under 18 U.S.C. § 3184, a judicial officer is required to make a determination as to whether the evidence submitted is "sufficient to sustain the charge under provisions of the proper treaty or convention." Article 3 of the Treaty states that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." 31 U.S.T. 5059. It is well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses. *See, e.g., Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933); *United States v. Wiebe,* 733 F.2d 549, 554 (8th Cir.1984). The rationale for this rule is that extradition is an executive function, not a judicial one. *See Martin v. Warden,* 993 F.2d 824, 828 (11th Cir.1993). Hence, an extradition proceeding is not a criminal proceeding, but rather serves an independent review function. *Id.* Accordingly, the Seventh Circuit has acknowledged that in the context of extradition, "we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations." *In re Extradition of Burt,* 737 F.2d 1477, 1487 (7th Cir.1984) (citing *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)). Courts have long been unsympathetic to objections to extradition which "savor of technicality." *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916).

### 1. Standard of Probable Cause

■ The standard of probable cause in an extradition hearing is established by federal law. *Eain v. Wilkes,* 641 F.2d at 507–08. The assessment to be made is therefore similar to the one in a preliminary hearing under the Federal

Rule of Criminal Procedure 5.1 ("Rule 5.1"). *Ward v. Rutherford,* 921 F.2d at 287; *see also Benson v. McMahon,* 127 U.S. 457, 462–63, 8 S.Ct. 1240, 32 L.Ed. 234 (1888). This Court is not required to determine whether Ortiz is guilty, but merely whether there was competent legal evidence which would justify his apprehension and commitment for trial if the crime had been committed in Illinois. *Collins v. Loisel,* 259 U.S. 309, 314–315, 42 S.Ct. 469, 66 L.Ed. 956 (1922). Probable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *In re Extradition of Guillen,* No. 90 CR 1056, 1991 WL 149623, at *8 (N.D.Ill. July 12, 1991) (citing *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir. 1973)). "In making this determination, courts apply a 'totality of the circumstances analysis' and 'make a practical, common sense decision whether, given all the circumstances ..., there is a fair probability' that the defendant committed the crime." *In re Extradition of Okeke,* No. 96–7019P–01, 1996 WL 622213, at *5 (D.N.J. Sept.5, 1996) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

On the other hand, "when a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient *inidicia* of reliability or credibility to establish probable cause." *In re Extradition of Singh,* 124 F.R.D. 571, 577 (D.N.J.1987); *see also Eain v. Wilkes,* 641 F.2d at 510 (statements of accomplice reliable because they were against his own interest); *Republic of France v. Moghadam,* 617 F.Supp. 777, 783 (N.D.Cal.1985) (extradition denied because recantation of sole accuser had more indicia or reliability than accusations). Likewise, where charges amount to mere conclusory allegations un-supported by substantive evidence, extradition will be denied. *U.S. v. Fernandez–Morris,* 99 F.Supp.2d 1358, 1366 (S.D.Fla. 1999).

There are crucial distinctions between the assessment to be made in an extradition hearing and one to be made in a preliminary hearing under Rule 5.1. These distinctions are ultimately grounded on the fundamental principle of comity that, among nations, "no one can rightfully impose a rule on another." *Rosado v. Civiletti,* 621 F.2d 1179, 1192 (2d Cir.1980) (citing *The Antelope,* 10 Wheat. 66, 23 U.S. 66, 122, 6 L.Ed. 268 (1825) (Marshall, C.J.)). First, an extradition hearing is not a criminal proceeding. *DeSilva v. DiLeonardi,* 181 F.3d 865, 868 (7th Cir.1999). The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply to extradition proceedings. Fed. R.Evid. 1101(d)(3); Fed.R.Crim.P. 1(a)(5)(A); *see also Eain v. Wilkes,* 641 F.2d at 508.

At an extradition hearing, the defendant's right to challenge the evidence introduced against him is quite limited. He can offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it. *Lindstrom v. Gilkey,* No. 98 C 5191, 1999 WL 342320, at *5 (N.D.Ill.1999) ("[T]he court must seek to distinguish between "contradictory," which is not admissible, and "explanatory" evidence, which is admissible") (citing *Eain,* 641 F.2d at 512 (holding that contradictory evidence was not admissible); and *Matter of Guillen,* No. 90 CR 1056, 1991 WL 149623, at *8 (N.D.Ill.1991) ("The accused in an extradition hearing is not entitled to contradict the demanding country's proof or pose questions of credibility, but is limited to offering evidence which explains or clarifies that proof")). The court in *Matter of Sindona* discussed

the difference between explanatory and contradictory evidence:

> The distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence," the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

450 F.Supp. 672, 685 (S.D.N.Y.1978)

 Moreover, constitutional protections applicable in criminal proceedings have been held inapplicable in the context of extradition. For example, the Sixth Amendment right to a speedy trial and the Fifth Amendment right against undue delay are inapplicable to an extradition. *Martin v. Warden,* 993 F.2d at 829; *In re Extradition of Burt,* 737 F.2d at 1486. Likewise, the Sixth Amendment right to effective counsel does not apply to extradition proceedings. *DeSilva v. DiLeonardi,* 181 F.3d at 868–69. The Supreme Court has found no constitutional infirmity where those subject to extradition proceedings have been denied an opportunity to confront their accusers. *Bingham v. Bradley,* 241 U.S. at 517, 36 S.Ct. 634. *See also Esposito v. Adams,* 700 F.Supp. 1470, 1476 (N.D.Ill.1988). Finally, the Fifth Amendment guarantee against double jeopardy and the right to a Miranda warning are inapplicable to an extradition proceeding. *In re Extradition of Powell,* 4 F.Supp.2d 945, 951 (S.D.Cal.1998).

 However, the Supreme Court has expressly found that "[c]ompetent evidence to establish reasonable grounds [to extradite] is not necessarily evidence competent to convict." *Fernandez v. Phillips,* 268 U.S. at 312, 45 S.Ct. 541. Indeed, some courts have suggested that competent legal evidence in an extradition proceeding is merely that evidence which is admissible by statute. *In re Extradition of Greer,* No. 91–90, 1991 WL 311924, at *6 (D.Vt. Nov.20, 1991); *Caputo v. Kelly,* 19 F.Supp. at 738. Other courts have concluded that competent legal evidence is simply that evidence which the presiding judicial officer deems sufficiently reliable to properly consider. *Mainero v. Gregg,* 164 F.3d at 1206–07; *Quinn v. Robinson,* 783 F.2d 776, 815–16 (9th Cir.1986). Indeed, the Supreme Court has found that extradition may be predicated entirely on the "unsworn statements of absent witnesses." *Collins v. Loisel,* 259 U.S. at 317, 42 S.Ct. 469; *see also In re Extradition of Salas,* 161 F.Supp.2d at 925.

### 2. Evidence of Simple Intentional Homicide

The following is the documentary evidence provided by Mexico as to the existence and basis of the charge of Simple Intentional Homicide against Ortiz. The documents are contained in the 21 exhibits provided by Mexico.

#### a. Ricardo Flores Martinez ("Martinez")

On April 25, 1999, Martinez was at a gas station restaurant north of San Francisco de los Romo eating with a friend, Ramon Ortiz ("Ramon"). Ex. 14.[2] About fifteen minutes after they arrived at the restaurant, Martinez heard two cars arrive and

---

**2.** The following facts, according to Martinez, stem from his sworn statement, taken on June 14, 1999, before Erasmo Flores De Luna, Deputy District Attorney, in Pabellon de Arteaga, Aguascalientes. Martinez's statement is Exhibit 14, provided by Mexico.

then Filemon Esquivel (Filemon Esquivel Esparza, hereinafter "Esquivel"), who is from the same town as Martinez and is his brother-in-law's brother, came into the restaurant. Esquivel shouted, "Let's go—Run," and Martinez and Ramon stood up and saw a white car with dark windows and a green Datsun truck, which Martinez recognized as Esquivel's. Esquivel hid behind a counter and Ramon sat down, but Esquivel remained standing and clearly saw two people in the white car. He had seen three people in the green truck, but Esquivel, who had been in the green truck, ran inside the restaurant. Also in the green truck he saw Garcia Ramos and Ramon Ramos (Ramon Ramos Hernandez, hereinafter "Hernandez").

In the white car, Martinez "identified the Rungo who is also known as the Tatu and whose name [he] only [knew] as Octavio." He described Octavio as short, "sort of light brown skin," approximately 20–years–old or younger, really short hair, and dressed in the loose-fitting, oversized "cholo" style, with really loose white pants, a t-shirt with letters on the front and back. He also said that one physical characteristic of Ortiz is that he wears a goatee called a lock. Esquivel described the other person in the white car as a male, light-skinned, not very tall, head almost shaved, and was wearing a light-colored t-shirt. Regarding Ortiz, Martinez had met him four or five years before the incident when the two of them worked together at Pulpas, a place that makes concentrates out of fruit. Martinez knew he was from San Pancho, he fights a lot, and he disappeared all of a sudden for a while, which Martinez later learned that he was in the United States.

From Martinez's vantage point in the restaurant looking through the windows when he stood up, the two cars were about ten or twelve meters away. He saw Ortiz was already out of the white car and he had a black gun in his right hand. Ortiz then fired the gun towards the truck from a very close distance, he hit the rear window, and Garcia Ramos, who was inside the truck, received the bullet. Hernandez tried to run and Ortiz shot him as well. Hernandez fell and then the person with Ortiz hit Hernandez's body twice with a pipe. Ortiz and his companion then got back into the white car and left on the highway heading north at a high speed. Martinez saw that Garcia Ramos was still in the truck and sort of bent over. Martinez was really afraid, so he and his friend left the restaurant. Upon leaving the restaurant, he saw Hernandez lying on the ground and Garcia Ramos sitting in the middle of the truck's cab. Martinez and his friend then left the scene.

Finally, Martinez said that because he knew Ortiz he stayed standing in the restaurant and saw everything that happened. Everything happened very quickly from the time the two vehicles arrived until the white car left; it all happened in less than three minutes.

### b. Esquivel

On April 25, 1999, at approximately 4:30 p.m., Esquivel was driving a green Datsun truck, model 1974, with license plate AA–66438, which he owns, along the main highway from Las Animas to San Francisco de los Romos going from east to west. Ex. 6.[3] With him in the truck's cab were Garcia Ramos, seated in the middle, and Hernandez, seated in the passenger seat. When

---

**3.** The following facts, according to Esquivel, stem from his sworn statement, taken on April 26, 1999, before Francisco J. Esparza Hernandez, Deputy District Attorney, in the City of Aguascalientes, Aguascalientes. Esquivel's statement is Exhibit 6, provided by Mexico.

they got to the speed bump outside the Animas Church, a white Chevrolet, described as foreign and "cholo" style, appeared and obstructed their lane. When Esquivel's truck caught up with the white car, Esquivel turned to the driver, who was a pale-skinned male, with very short hair, almost bald, and was dressed in loose-fitting, oversized clothing, which is the "cholo" style. Esquivel told the driver to not get in the way and to move on, and the driver answered, "What do you want, asshole?" Esquivel decided to ignore him and continue on.

About an hour later, however, Esquivel and his passengers encountered the same white car on the main street of San Francisco de los Romos. Esquivel then realized that the driver of the white car was "trying to get on top of [him]" because he was traveling in the opposite direction. This caused him to leave the road, spin around, and end up facing the same direction as the white car. Then he saw that the white car tried to hit him, did a u-turn, and started firing a gun, so Esquivel tried to enter the gas station and told his two friends in his car to be ready because the two guys in the white car wanted to kill them. Esquivel proceeded to the restaurant at the gas station, braked, and before the truck stopped he exited and ran towards the restaurant. He then saw two males get out of the white car, and one of them was carrying a submachine gun and the other was also carrying a gun.

Next, while hiding in the restaurant, Esquivel heard two shots, then went outside, and saw Hernandez lying on the ground with a wound in his leg and Garcia Ramos dead inside the vehicle bleeding from his head. He then tried to notify the San Francisco Police, and the Judicial Po-

lice came and retrieved Garcia Ramos' body. Finally, Esquivel did not recall the physical descriptions of the assailants in the white car, which he explained was due to his fear and need to hide, nor did he know their identities.

### c. Hernandez

In the afternoon on April 25, 1999, Hernandez was in Esquivel's truck with Garcia Ramos and Esquivel driving to Emiliano Zapata from Pabellon, and they were drinking beer. Ex. 15.[4] When they came to the Animas crossing, a white car with two people in it crossed, the drivers exchanged words, and Hernandez, Esquivel, and Garcia Ramos returned to Emiliano Zapata. They saw the white car again, ignored it, continued on the highway, and the white car then followed them very closely on the highway leading to San Pacho. Hernandez did not notice if the passengers in the white car shot at them at that point.

Upon arriving at the gas station, they "parked," and the white car stopped behind them. Hernandez exited the truck first because he was sitting on the passenger side, Garcia Ramos was in the middle, and Esquivel was driving. When he got out, a really "pissed off" guy was there, he took out a gun, and shot Hernandez in the right leg from about four meters away. Hernandez fell to the ground because of the pain. He did not see what kind of gun it was or where it was from, but the guy who shot him was about 1.60 meters in height, he was bald, and though Hernandez cannot remember what he was wearing, he remembers that the guy was dressed in the loose, oversized "cholo"

---

4. The following facts, according to Hernandez, stem from his sworn statement, taken on April 25, 1999, before Francisco Javier Esparza Hernandez, Deputy District Attorney, in the City of Aguascalientes, Aguascalientes. Hernandez's statement is Exhibit 15, provided by Mexico.

style. He said when he got out of the truck everything happened really fast.

Hernandez did not see if the other guy got out of the white car. They did not try to attack Hernandez with any object when he was sitting in the truck. He did not see what Esquivel was doing. Finally, just as Garcia Ramos was trying to get out, the same guy that shot Hernandez shot Garcia Ramos. He did not see what side or from where he shot him because he was on the ground, and he did not recall if there were people around.

### d. Humberto Rodriguez Ortiz ("Humberto")

Humberto is Ortiz's brother. Ex. 7.[5] On Sunday, April 18, 1999, Humberto, Ortiz, arrived in the city of Aguascalientes with their mother and grandmother via plane from Chicago. They were on vacation to attend the San Marcos National Fair. On April 25, 1999, Humberto's nephew was baptized. His nephew is the son of his sister, Belinda, and a man he only knows as The Menazas ("Menazas"), who has a white Cadillac. Humberto's brother, Ortiz, and Menazas are good friends and have known each other for a long time. There was a party at the house of Menazas' family, which is in Las Animas. Menazas and Ortiz were only at the party for a short time. Humberto knew this because some girls were asking for Menazas, and Menazas' mother told Humberto that Menazas was gone because the white car was gone. Because of their good friendship, Humberto assumed Ortiz left with Menazas.

Humberto described Menazas as 1 meter and 75 centimeters in height, approximately 29 years old, heavy build, short, brown hair, dark-skinned, with a distinguishing beard, which was worn close at the time, and he usually wears loose-fitting, oversized, "cholo" style clothing. Humberto described his brother, Ortiz, as 1 meter and 65 centimeters in height, approximately 23 years old, light build, dark-skinned, very short hair, almost bald, he only wears a beard on his chin, and he usually wears loose-fitting, oversized, "cholo" style clothing. Finally, Humberto stated that he did not know if Menazas had any firearms because he did know him very well.

### e. Juan Gabriel Perez Martinez ("Juan")

Juan was working at the gas station in San Francisco de los Romos on April 25, 1999. Ex. 3.[6] At about 4:30 p.m., he heard two vehicles braking fast and then saw the two vehicles stopped in front of the gas station restaurant. The vehicle in front was a green, Nissan truck and the other was a white car, which was an older model but well-looked after, although he did not remember the maker. Two males exited the white car.

The passenger was short, bald, wore loose-fitting, oversized, "cholo" style clothing, was carrying a firearm, which looked like a squad pistol, and ran to the where the bathrooms are. He then shot at one of the persons that was riding in the green truck and injured him because the victim was complaining. Then the driver of the white car, who was tall with a large build,

---

**5.** The following facts, according to Humberto, stem from his sworn statement, taken on April 26, 1999, before Francisco J. Esparza Hernandez, Deputy District Attorney, in the City of Aguascalientes, Aguascalientes. Humberto's statement is Exhibit 7, provided by Mexico.

**6.** The following facts, according to Juan, stem from his sworn statement, taken on April 25, 1999, before Francisco J. Esparza Hernandez, Deputy District Attorney, in the City of Aguascalientes, Aguascalientes. Juan's statement is Exhibit 3, provided by Mexico.

ran to the left side of the green truck with a wheel club in his hands, which he used to hit the person in the middle seat. Then the guy with the gun told him to calm down and move away, and he took out the gun near the hood of the truck and fired a shot that hit the rear window. Both assailants then got into their car and fled the scene heading north. The driver of the green truck managed to escape inside the restaurant and thus the assailants could not do anything to him. Juan then went over to the green truck, saw that the middle passenger was bleeding from the head, and assumed he had died. Finally, Juan did not see who took the injured person to receive medical attention.

### f. Photo Array

On March 15, 2006, Juan, the employee at the gas station on April 25, 1999, identified Ortiz out of a photo lineup. Ex. 21.[7] Juan was shown six photographs. One photo was of Ortiz, and this photo was color. The other five photos were of men with builds and features similar to those of Ortiz, and these photos were black and white. After viewing the six photographs, Juan stated that he did "not remember to have seen" the person charged with the criminal conduct before the incident. He also said he had not seen the perpetrator since the incident. Then when asked to identify the male that shot Garcia Ramos on April 25, 1999, Juan stated, "That I am almost sure that is the photograph located in SECOND PLACE, and that answers to the name of OCTAVIO RODRIGUEZ OR-TIZ OR OSCAR RODRIGUEZ ORTIZ." Juan said he recognized Ortiz "[s]ince the physical characteristics are the same in his face and by the type of hair he had, which

was very short." Juan also stated that he had never heard Ortiz speak.

On March 17, 2006, Martinez, the witness in the restaurant eating with a friend on April 25, 1999, also identified Ortiz out of a photo lineup.[8] Martinez was shown the same six photographs Juan was shown; one of Ortiz in color, and five in black and white of men with similar builds and features to Ortiz. After viewing the six photographs, Martinez stated that before the incident he "knew [Ortiz] just by sight, having no dealings with him, since we worked together in the same place for a while, but [he] had not seen [Ortiz] for about twelve years because [Ortiz] went to the United States of America." Martinez had not seen Ortiz since the incident. Then when asked to identify the male that shot Garcia Ramos on April 25, 1999, Martinez stated, "I am sure that it is the photograph located in FOUR PLACE, and that answers to the name of OCTAVIO RODRIGUEZ ORTIZ OR OSCAR ROD-RIGUEZ ORTIZ." When asked how he recognized Ortiz, Martinez answered:

> As I said above, I previously knew him just by sight, and he is the same person that is called "EL TATU," and who is named OCTAVIO and because the physical characteristics of the person in the photograph that I indicated, are the same in his face and the type of hair he had, which was very short almost shaved, that is to say almost without hair and it is the same person that was under the white colored car and that carried a gun in his right hand and that fired a shot towards the green truck and that with this shot he hit JOSE DE

7. Juan appeared before Jaime Vargas Macias, public prosecutor, in Pabellon de Arteaga, in a proceeding to identify a person by means of photographs. These facts appear in Exhibit 21, provided by Mexico.

8. Martinez appeared before Jaime Vargas Macias, public prosecutor, in Pabellon de Arteaga, in a proceeding to identify a person by means of photographs. These facts appear in Exhibit 21, provided by Mexico.

JESUS GARCIA RAMOS, who died at that place inside the green truck.

Martinez also stated that he had not heard Ortiz speak.

### 3. Ortiz's Arguments Against Probable Cause

Ortiz offers four arguments in support of his contention that the government has failed to establish probable cause on the charge of simple intentional homicide: (1) Mexico provided no physical evidence to support its charge; (2) the photo array was suggestive and flawed; (3) the witness statements conflict with different accounts of what transpired and thus cannot be relied upon; and (4) Martinez's identification of Ortiz is inconsistent with Ortiz's background. Each argument will be considered in turn.

### a. Physical Evidence Is Not Required For A Finding Of Extraditability.

■ Ortiz challenges the government's case for probable cause on its lack of physical evidence. However, physical evidence need not be provided for extradition to be ordered. *See, e.g. Bovio v. United States,* 989 F.2d 255, 259–261 (7th Cir.1993) (finding a Swedish investigator's affidavit sufficient to establish probable cause, notwithstanding the defendant's argument that there was no physical evidence implicating him in the criminal activity); *Eain v. Wilkes,* 641 F.2d at 509–511 (finding the affidavits of an accomplice, coroborated by the affidavits of a police officer and a second civilian witness sufficient to establish probable cause). Therefore, physical evidence is not needed and the Court may find probable cause based on documentary evidence and sworn affidavits alone.

### b. Photo Array Evidence is Admissible

■ Ortiz argues that the procedure employed by Mexico in the photo array identification process was significantly flawed. Specifically, Ortiz argues that the procedure was unduly suggestive. The procedure, set forth above, involved Martinez and Juan separately identifying Ortiz out of a photo lineup. Each witness viewed six photographs; one of Ortiz and five of men with similar features and builds. However, the photo of Ortiz was in color, and the other five were black and white. Ortiz takes issue with his photo being the only one in color, arguing that highlighting his photo in this manner was unnecessarily suggestive and would have deprived him of due process had this procedure been used in the United States. Finally, Ortiz argues that under the theory of "explanatory evidence," this Court can consider the improper methods used by Mexico in its witness identification procedure.

■ The Court recognizes that the procedure employed by Mexico in the identification process was not perfect. Clearly, highlighting the accused's photo in color while the other photos were black and white diminishes some of the evidentiary value that can be extrapolated from such a process. However, as Ortiz acknowledged in his argument, the Court can still consider the two identifications; Ortiz merely asks this Court to grant them less weight. As the court in *U.S. v. Kin–Hong,* 110 F.3d 103, 121 (1st Cir.1997), noted, "[t]he reliability of the evidence is a factor for the reviewing court to consider … and potentially unreliable evidence may be accorded reduced weight by the court."

■ The Court will take into consideration the suggestive nature of the identification process in its assessment of the evidence below, but the Court notes that less-than-perfect procedure notwithstanding, two eyewitnesses at the scene of the murder identified Ortiz out of a photo lineup. While the evidentiary value of such an

identification is somewhat diminished, plenty still remains.[9]

### c. The Conflicts Among the Sworn Statements Are Minor and Do Not Reduce Their Evidentiary Weight.

Ortiz argues that there are conflicts and contradictions among some of the sworn statements provided by Mexico. Specifically, Ortiz claims that the accounts of Esquivel and Hernandez and the accounts of Hernandez and Martinez provide "wildly divergent" descriptions of what occurred April 25, 1999, which only creates greater uncertainty.

### i. Esquivel and Hernandez

Esquivel, the driver of the green truck, said that: (1) the occupants of the white car shot at the truck before they reached the gas station; (2) the white car almost forced them off the road causing the green truck to leave the road and spin around; and (3) upon reaching the gas station, he exited the truck while it was moving. In contrast, Hernandez, the surviving passenger of the green truck, stated that: (1) while driving in the green truck, he "didn't notice" if they at that point had been shot at by the individuals in the white car; (2) he did not mention the white car forcing their truck off the road and causing it to spin around; and (3) he got out of the truck first after they arrived at the gas station and never mentioned Esquivel leaving the truck while it was moving.

The first alleged "conflict" is not a discrepancy. Esquivel claimed they were shot at before arriving at the gas station and Hernandez said he did not notice if they were. The accounts simply do not conflict. There would only be a conflict Esquivel claimed they were shot at and Hernandez categorically said they were not. That is the not the case here.

The second alleged "conflict" is also not a discrepancy. Esquivel described the car being forced off the road and spinning around. Hernandez made no mention of it. Again, the accounts simply do not conflict. There would only be a conflict if Esquivel described the off-road, spin-around incident and Hernandez categorically denied its occurrence. That is not the case here. Hernandez simply said nothing about such an incident. And considering all that transpired that day, including getting shot in the leg and witnessing a fatal shooting, his omission of the vehicular incident does not call into question the veracity of his account.

The third alleged "conflict" is a minor detail and may not even be a discrepancy. Esquivel said that after arriving at the gas station, "I braked and before the vehicle stopped, I got out and ran" into the restaurant. Ex. 6. Hernandez stated that after arriving at the gas station, "we 'parked' at the gas station ... and I got out of the truck first because I was sitting on the right side of the truck, meaning beside the right-hand door." Ex. 15. Clearly, Es-

9. Ortiz mentioned due process in asking this Court to accord the identification procedure less weight, but he did not allege a due process violation. Regardless, the Court notes that in *Kin–Hong*, 110 F.3d at 120, that court admitted two statements that the defendant claimed would be inadmissible at trial under the requesting country's law. Thus, the defendant argued that it was inherently unfair to certify that he was extraditable on the basis of evidence that would be inadmissible in the court where he would face trial. Rejecting this argument, the court acknowledged that serious due process concerns could merit review beyond the narrow scope of inquiry in extradition proceedings, but found that "there [was] no serious due process issue [because the defendant's] liberty interests [were] protected by the very existence of 'an unbiased hearing before an independent judiciary.'" (quoting *In re Kaine*, 55 U.S. 103, 14 How. 103, 14 L.Ed. 345 (1852)). The same scenario applies in the instant case, and this Court is free to consider both identifications.

quivel did not assert that he was the first out of the vehicle. He merely said he left the vehicle before it stopped moving. Thus, Hernandez's assertion that he was first out of the vehicle is not in conflict with Esquivel's version. Moreover, Hernandez's sworn statement put quotations around the word "parked." The Court might infer that Hernandez was saying they "parked," but the car had not stopped moving. Or, Hernandez's assertion that he got out first might have been referring to why he fled the vehicle and Garcio Ramos, the decedent, stayed in the truck. And again, Hernandez not saying that Esquivel left the truck while it was moving does not render his statement inconsistent. Regardless, the detail of who left the truck first is immaterial considering the circumstances; they were being chased by a white car and the result was two gunshot victims, one being a homicide. Even if their accounts conflicted on the issue of who left the car first, which it arguably does not, this detail is not enough to question the veracity of their statements.

### ii. Hernandez and Martinez

Hernandez said that "when [he] got out [of the truck] everything happened really fast," a really "pissed off" guy was there, he took out a gun, and shot Hernandez in the right leg from about four meters away. Ex. 15. Hernandez fell badly to the ground because of the pain. He did not see what kind of gun it was or where it was from, but the guy who shot him was about 1.60 meters in height, he was bald, and though Hernandez cannot remember what he was wearing, he remembers that the guy was dressed in the loose, oversized "cholo" style.

Hernandez did not see if the other guy got out of the white car. They did not try to attack Hernandez with any object when he was sitting in the truck. He did not see what Esquivel was doing. Finally, just as Garcia Ramos was trying to get out, the same guy that shot Hernandez shot Garcia Ramos.

Martinez said that from his vantage point in the restaurant, the two cars were about ten or twelve meters away. He saw that Ortiz was already out of the white car and he had a black gun in his right hand. Ortiz then shot towards the truck from a very close distance, he was practically at the bed of the truck, he hit the rear window, and Garcia Ramos was hit by the bullet. Hernandez tried to run and Ortiz shot him as well. Hernandez fell and then the person with Ortiz hit Hernandez's body twice with a pipe. Ortiz and his companion then got back into the white car and left on the highway heading north at a high speed. Finally, Martinez also said that everything happened very quickly from the time the two vehicles arrived until the white car left; it all happened in less than three minutes.

Ortiz argues that two discrepancies exist: (1) diverging accounts of who was shot first and (2) whether Hernandez was hit with a pipe. Regarding the alleged first "conflict," Hernandez clearly stated that he was shot first. However, Martinez's statement does not affirmatively assert that Garcia Ramos was shot first. Martinez merely said he saw Ortiz shoot the rear window and hit Garcia Ramos, and "I also saw that [Hernandez] tried to run and [Ortiz] shot him." Ex. 14. Martinez describes the shooting of Garcia Ramos first, but he does not state that "then" Ortiz shot Hernandez. He simply described the shooting of Hernandez second. Moreover, Juan, the gas station employee, said that Hernandez was shot first. Ex. 3. There is not a discrepancy, but even if there was, both Martinez and Hernandez stated that everything happened really fast and a conflict of who was shot first does not lessen the value of their statements.

Regarding the alleged second "conflict," Martinez said that after Hernandez was shot and fell to the ground, Ortiz's accomplice hit him twice with a pipe, yet Hernandez did not mention this occurring. This is another example of someone alleging something happened and Hernandez making no mention of it. As explained above, silence does not create a discrepancy. Moreover, Hernandez specifically stated that "they didn't try to attack me with any object when I was sitting in the truck." Ex. 15. The Court might infer that by Hernandez affirmatively stating he was not attacked with any object while sitting in a truck, he is tacitly stating that he was attacked with an object while outside the truck. Regardless, a major discrepancy does not exist.

The Court finds Ortiz's alleged contentions as to inconsistencies in the record unpersuasive. If the accounts conflict, which is questionable, they are certainly not "wildly divergent." Also, the accounts parallel each other on the major issues. Regardless, providing an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition. These issues, raised by Ortiz, are all properly reserved for the eventual trial in Mexico.

#### d. Martinez's Identification Of Ortiz Cannot Be Impeached With Contradictory Evidence Submitted By Ortiz.

█ Lastly, Ortiz argues that Martinez's purported basis for recognizing Ortiz, that they worked together, conflicts with Ortiz's background. In his sworn statement, taken on June 14, 1999, Martinez said he met Ortiz about four or five years prior to that date when they were working together, which would have been 1994 or 1995. To dispute Martinez's statement, Ortiz references the Pretrial Services Report, which states that Ortiz was born in 1978 in Mexico and lived there until he immigrated to the United States in 1990. Def. Ex. B. Thus, Ortiz argues, Martinez's statement provides false information because Ortiz was in the United States in 1994 and 1995, when Martinez claims they worked together.

Notwithstanding the alleged discrepancy, the Court cannot consider the Pretrial Services Report in its determination of whether probable cause exists. As explained above, Ortiz can only offer "explanatory" evidence, he cannot offer "contradictory" evidence. The Pretrial Services Report is clearly contradictory evidence and thus cannot be considered by the Court. This issue is properly reserved for the eventual trial in Mexico. The Court can freely consider Martinez's statement and identification of Ortiz, which is unrefuted.

#### 4. Sufficiency of the Evidence

█ The Court finds the evidence submitted by the government of Mexico sufficient to support a finding of probable cause to extradite. There were four witnesses to the murder of Garcia Ramos and each witness provided a sworn statement. Esquivel drove the green truck, Hernandez was a passenger in the green truck, Martinez was dining in the restaurant, and Juan was working at the gas station. The statements were provided when the witnesses' recollections were fresh; two were given on the day of the incident, one was given the following day, and the fourth was given a little more than a month and a half later. After closely reviewing all four statements, the Court finds them reliable.

Esquivel, Hernandez, Martinez, and Juan all described a white car following Esquivel's green truck into the gas station on the afternoon of April 25, 1999. The white car had two passengers. One of the passengers shot and wounded Hernandez and the same passenger shot and killed

Garcia Ramos. Each of the four witnesses said the gunman was bald or had very short hair and was wearing oversized, loose-fitting, "cholo" style clothing. Esquivel, Martinez, and Juan said he was short; Hernandez did not comment on his height.

Ortiz's brother, Humberto, also provided a sworn statement, which placed Ortiz in the region of Mexico where the murder took place on April 25, 1999. Humberto said Ortiz was 1 meter and 65 centimeters in height, he had very short hair, almost bald, and he usually wears oversized, loose-fitting, "cholo style" clothing. Humberto said Ortiz was at a party with a man named Menazas on April 15, 1999. Menazas and Ortiz were good friends. Menazas owned a white car, he left the party in the white car, and Humberto assumed Ortiz was with Menazas when he left because of their good friendship.

Martinez said he recognized Ortiz as the person that shot Garcia Ramos because he had worked with Ortiz four or five years before the incident occurred and thus he recognized him on the day of the incident. Martinez and Juan also both separately identified Ortiz out of a six-photo, photo lineup.

Based on all of the evidence presented by the Government of Mexico and set forth in this opinion, the Court finds that there is competent legal evidence to support the finding of probable cause as to the crime of Simple Intentional Homicide against Ortiz.

## IV. CONCLUSION

Pursuant to 18 U.S.C § 3184 and the Extradition Treaty between the United States and the United Mexican States, May 4, 1978, 31 U.S.T. 5059, TIAS 9656, the Court finds that there has been presented sufficient evidence to compel a finding of probable cause to extradite Octavio Rodriguez Ortiz, also known as Oscar Rodriguez Ortiz or El Tatu, to Mexico.

*Accordingly, it is hereby adjudged, decreed, and ordered as follows:*

This matter is hereby certified to the Secretary of State.

This Certificate of Extraditability and Order of Commitment, together with all formal extradition documents received into evidence, together with a certified copy of all testimony and evidence taken at hearings and all memoranda of law filed on the issue of extradition, and all orders of court, shall hereby be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois so that a warrant may issue upon the requisition of the proper authorities of the United Mexican States for the surrender of Octavio Rodriguez Ortiz, also known as Oscar Rodriguez Ortiz or El Tatu, according to the provisions of the Extradition Treaty between the United States and the United Mexican States, dated May 4, 1978, 31 U.S.T. 5059, TIAS 9656.

Defendant Octavio Rodriguez Ortiz, also known as Oscar Rodriguez Ortiz or El Tatu, be and the same hereby is committed to the custody of the United States Marshal pending his surrender to the United Mexican States, or until further order of court.