## In the Matter of the EXTRADITION OF Heriberto GARCIA.

### Misc. Action No. L–10–027.

United States District Court,
S.D. Texas,
Laredo Division.

Sept. 25, 2011.

Federal Public Defender, Christina Arellano–Villarreal, John Samuel Paul, Office of the Federal Public Defender, Laredo, TX, for Heriberto Garcia.

## MEMORANDUM AND ORDER

J. SCOTT HACKER, United States Magistrate Judge.

Pending before the Court is the United States Government's "Formal Extradition Request" (Dkt. No. 10) filed on behalf of the Mexican Government who is seeking to extradite Mr. Heriberto Garcia ("Respondent") for a homicide he allegedly committed in Mexico. Also pending before the Court is Respondent's "Motion not to Extradite to Mexico (Pro Se)" (Dkt. No. 28). For the reasons set forth below, the "Formal Extradition Request" (Dkt. No. 10) is GRANTED, and Respondent is hereby CERTIFIED as extraditable. Furthermore, Respondent's *pro se* motion is DENIED.

## I. EXTRADITION PROCESS

The process of extraditing a fugitive from the United States to Mexico is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181–3196, and the extradition treaty between the United States and Mexico (the "Treaty"). The Treaty provides that the United States and Mexico mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. Extradition Treaty, U.S.-Mex., art. 1, May 4, 1978, 31 U.S.T. 5059. Moreover, "[i]t is

well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses." *In re Extradition of Rodriguez Ortiz,* 444 F.Supp.2d 876, 883 (N.D.Ill. 2006) (citing *Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933)); *see United States v. Wiebe,* 733 F.2d 549, 554 (8th Cir.1984).

The foreign extradition process begins with the discovery of a foreign fugitive within the territory of the United States. Mexico may then request the provisional arrest of the fugitive, and the United States must comply with a valid request. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. The request must contain a description of the person sought, a description of his or her alleged crimes, a declaration of the existence of a warrant for his or her arrest, and an undertaking to submit a formal request for extradition. *Id.* A judicial officer is authorized to issue a warrant for the arrest of any fugitive whose extradition is requested, upon a sworn complaint charging the fugitive with committing an extraditable offense. 18 U.S.C. § 3184. If a formal request for extradition and the required supporting documents are not filed within sixty days of the apprehension of the fugitive, the provisional arrest must be terminated. Extradition Treaty, U.S.-Mex., art. 11, May 4, 1978, 31 U.S.T. 5059. However, this will not prejudice the extradition once the required documents have been submitted. *Id.*

The second stage in the extradition process is the submission of a formal request for extradition. The required contents of a formal request for extradition, along with supplementary documents, must be submitted through diplomatic channels. Extradition Treaty, U.S.-Mex., art. 10, May 4, 1978, 31 U.S.T. 5059. Among the documents required for a fugitive not yet convicted in the foreign country are a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there." *Id.* Documentary evidence proffered by the Mexican government shall be admissible in evidence if it is properly authenticated and certified by the principal consular officer of the United States in Mexico. *Id.;* 18 U.S.C. § 3190.

The next stage in the extradition process is the extradition hearing conducted by a federal court in order to hear the evidence and determine whether that evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. "Extradition shall be granted only if the evidence be found sufficient according to the laws of the requested Party, . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059.

Finally, where the judge determines that the evidence is sufficient to warrant extradition, the judge then certifies to the Secretary of State that the fugitive may be detained and surrendered to the requesting country and forwards all the evidence taken before him to the Secretary of State. 18 U.S.C. § 3184; *Ntakirutimana v. Reno,* 184 F.3d 419, 422 (5th Cir.1999). If the fugitive was released on bail from provisional arrest, the judge must also issue a warrant for the commitment of the fugitive until surrender to Mexico can be made. 18 U.S.C. § 3184. "The ultimate decision to extradite is a matter within the exclu-

sive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.1980). Thus, the executive branch, through the Secretary of State, is the final arbiter of whether an individual will be detained in the United States and delivered to the requesting foreign country. *See* 18 U.S.C. § 3186; *see also Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971). If extradition is granted, surrender shall then be made at such time and place as determined according to the laws of the requested country, the United States. Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059.

## II. REQUEST FOR EXTRADITION OF RESPONDENT HERIBERTO GARCIA

On October 15, 2010, the United States Government initiated extradition proceedings against Respondent upon filing of their "Complaint for Provisional Arrest with a View Toward Extradition" (Dkt. No. 1) on behalf of the Mexican Government. The Government alleges that Respondent is wanted for the crime of homicide by Mexican authorities. (Dkt. No. 1, ¶ 5). Specifically, he is accused of shooting and killing Alfredo Colunga–Salinas ("Mr. Colunga–Salinas") in Las Botellas bar in Nuevo Laredo, Tamaulipas, Mexico. (*Id.* at ¶ 6). Upon making the required probable cause determination, this Court issued an arrest warrant for Respondent in accordance with 18 U.S.C. § 3184 and the Treaty. (Dkt. No. 2). Consequently, Respondent was arrested on October 28, 2010, and made his initial appearance before the Magistrate Court on November 1, 2010, where he was appointed counsel from the

Federal Public Defender's Office. (Dkt. Nos. 3, 4).

On November 3, 2010, District Judge Micaela Alvarez issued an oral order reassigning the case to the undersigned. (*See* November 3, 2010 Minute Entry). On November 4, 2010, the Court issued a Scheduling Order in this case. (Dkt. No. 9). A detention hearing was then held on November 15, 2010. At the detention hearing, the Court advised the parties that it would take the parties' arguments under advisement and would issue an order at a later date. (*See* November 15, 2010 Minute Entry). In the interim, the United States Government filed its "Formal Extradition Request" with supporting documentation (Exhibits 1–40) on November 16, 2010.[1] (Dkt. No. 10). On November 19, 2010, Respondent filed his "Motion for Bond Pending Extradition Hearing" (Dkt. No. 11), to which the Government responded (Dkt. No. 12) on November 22, 2010. On December 30, 2010, 761 F.Supp.2d 468 (S.D.Tex.2010), the Court issued its Memorandum and Order (Dkt. No. 17) denying Respondent's motion for bond. Thereafter, the Government filed its "Amended Memorandum in Support of Extradition" (Dkt. No. 19) on February 1, 2011.

On March 14, 2011, Respondent filed his "Motion not to Extradite to Mexico (Pro Se)" (Dkt. No. 28). After multiple continuances, the extradition hearing was held on April 20, 2011. At the hearing, the Government summarized the documents submitted in support of its "Formal Extradition Request." (*See* April 20, 2011 Minute Entry). In response, Respondent advanced five main arguments against extradition. (*Id.*). First, he asserted that there is alibi evidence that obliterates probable cause. Second, he argued that the identifi-

---

1. The supporting documents provided by the United States Government were properly authenticated in accordance with 18 U.S.C. § 3190 by David T. Donahue, the Minister Counselor for Consular Affairs, on March 13, 2007.

cation procedures employed by the Mexican authorities are problematic. Third, he questioned the credibility of the witnesses who made statements to the Mexican authorities. Fourth, he argued that the Mexican Government failed to provide all potential evidence against him. Finally, he argued that there is some case law support for a humanitarian exception in international extradition cases.

That same day, Respondent filed his "Motion to Admit Respondent's Exhibits [1–15] into Evidence" (Dkt. No. 30). At the extradition hearing, the Court made a partial ruling on Respondent's motion to admit exhibits into evidence and admitted Exhibits 1, 12, and 13 into evidence. (*Id.*). The Court withheld ruling on the remaining exhibits until Respondent provided the Court with briefing on the application of a humanitarian exception to international extradition proceedings. (*Id.*). Neither party presented any witness testimony.

On April 25, 2011, Respondent filed his "Motion for Issuance of Witness Subpoena Duces Tecum" (Dkt. No. 31). In his motion, Respondent requested that the Court issue an order requiring the attendance of the Custodian of Records for the Department of Public Safety/Texas Rangers in Laredo, Texas, at the next status hearing to be set by the Court. (*See* Dkt. No. 31). Respondent subpoenaed the following documents:

> Any and all documents and reports pertaining to the investigation of the murder of Alfredo Colunga–Salinas, a.k.a. El Cholo, who was killed in Nuevo Laredo, Mexico on January 8, 2005, at the Bar La Botella, in which Heriberto Garcia was a suspect. On or about January 11, 2005, Mexican law enforcement authorities interviewed Heriberto Garcia at the Department of Public Safety Office.

*Id.* That same day, the Court granted Respondent's motion and set a status conference for May 3, 2011. (*See* Dkt. No. 33). At the May 3rd Status Conference, Respondent's counsel informed the Court that the subpoena *duces tecum* issued on April 25th to the Texas Department of Public Safety's ("DPS") custodian of records was not served due to a misunderstanding between the Federal Public Defender's office and the District Clerk's office. (*See* May 3, 2011 Minute Entry). The Court reissued the subpoena to be served by the United States Marshal's service. (*Id.*). In addressing Respondent's motion to admit exhibits into evidence, the Court ruled that Respondent's Exhibits 2–11 and 14–15 were not relevant to the issue of probable cause. (*Id.*). Nonetheless, the Court admitted Exhibits 2–11 and 14–15 for the limited purpose of preserving any error on the humanitarian exception raised by Respondent's counsel on April 20th. (*Id.*).

On May 6, 2011, the Court held a status conference to address Respondent's subpoena *duces tecum.* Respondent's counsel asked for additional time to review the documents submitted by the DPS office's custodian of records pursuant to the subpoena. (*See* May 6, 2011 Minute Entry). At the status conference held on May 9, 2011, Respondent's attorney offered, and the Court admitted, the documents provided by the DPS office's custodian of records, Exhibit 16, into evidence. (*See* May 9, 2011 Minute Entry).

## III. FACTUAL BACKGROUND

At approximately 11:15 a.m., on Saturday, January 8, 2005, two men arrived at a parking lot adjacent to Las Botellas bar[2]

---

**2.** The parking lot is located in downtown Nuevo Laredo, at the corner of Bravo and Juarez streets, in the opposite corner of Las Botellas. (Ex. 7, p. 1; Ex. 4, p. 1).

in a black, four-door, recent-model Dodge pickup truck.[3] (Ex. 4, p. 2; Ex. 7, p. 1; Ex. 4, p. 1; Ex. 8, p. 1). Hector Enrique Perez–Loredo ("Mr. Perez–Loredo"), the parking lot attendant, observed both men exit the Dodge pickup.[4] When the men exited the Dodge pickup, the driver was standing about ten meters from Mr. Perez–Loredo. (*Id.*). Mr. Perez–Loredo did not approach the men at that time because parking lot customers were not required to pay until they left the parking lot. (*Id.*). The driver then yelled "take care of it" to Mr. Perez–Loredo, and both men walked towards Las Botellas. (*Id.*). After approximately two hours, Mr. Perez–Loredo saw the men return to the Dodge pickup and open both passenger-side doors.[5] (Ex. 36, p. 3).

Fermin Ivan Villarreal–Lopez ("Mr. Villarreal–Lopez"), a bartender at Las Botellas, was sweeping outside Las Botellas when he also saw two men stand outside of the Dodge pickup while at the parking lot.[6] (Ex. 4, p. 1; Ex. 8, p. 1). The men stood next to the Dodge pickup with the doors open for approximately fifteen to twenty minutes. (Ex. 7, p. 1; Ex. 8, p. 1; Ex. 4, p. 1). Mr. Perez–Loredo approached the men thinking they were going to pay him, but the driver signaled and told him "we are not leaving yet." (Ex. 7, p. 1). The men closed the two doors on the passenger side and they returned to Las Botellas. (*Id.*). That was the last time Mr. Perez–Loredo saw both men. (*Id.*).

At approximately 2:30 p.m., Selene Hernandez–Arizaga[7] ("Ms. Hernandez–Arizaga") and Adelita Ramirez Rodriguez[8]

**3.** The Dodge pickup truck is a four-door, double cab as depicted in Exhibit 32.

**4.** According to Mr. Perez–Loredo, the driver was tall (approximately 1.8 meters, or five feet, eleven inches), robust, with a fair complexion, black hair, and no moustache and was wearing blue jeans and a dark green jacket. (Ex. 7, p. 1; Ex. 4, p. 2). Although Mr. Perez–Loredo could not remember the clothes the passenger was wearing because he did not see him well, he described him as thin and approximately 1.6 meters, or five feet, three inches, in height. (Ex. 7, p. 1).

**5.** The Court notes that Mr. Perez–Loredo initially stated that the men returned to the pickup truck after approximately thirty minutes. (Ex. 7, p. 1).

**6.** Mr. Villarreal–Lopez's description of the men standing next to the Dodge pickup in the parking lot differs to some extent from that of Mr. Perez–Loredo's. According to Mr. Villarreal–Lopez, one of the men was about thirty-five years old, "a blonde," tall, robust, fair complexion, black hair, with a goatee, wearing a short-sleeved white t-shirt, black pants, brown boots, and carrying a glass in his hand. (Ex. 8, p. 1). The Court notes that the description of "a blonde" with black hair appears to be directly contradictory. The term "guero" was used in the Mexican, Spanish-language documents. When translating "guero" from Spanish to English, "guero" can mean someone with blonde hair or someone with a fair complexion. Mr. Villarreal–Lopez described the other man as being about forty-five years old, dark complexion, with a moustache, wearing a green jacket, morello-cherry boots, jeans (the color of which he could not remember), a green cap, with a glass in his hand. (*Id.*). Mr. Villarreal–Lopez does not distinguish between the driver of the Dodge pickup and the passenger.

**7.** According to Ms. Hernandez–Arizaga, the men looked "as if they hadn't slept and as if they were drunk." (Ex. 9, p. 1). Ms. Hernandez–Arizaga described one of the men as being about thirty-years-old, tall, with a fair complexion, robust, black hair, goatee, wearing a white t-shirt and black denim pants, with a glass in his hand. · (*Id.*). The other man was about forty to forty-five-years-old, short, thin, dark skin, and he was wearing a green fabric jacket, black cap, moustache and had some silver crowns in his "superior teeth." (*Id.*).

**8.** According to Ms. Ramirez–Rodriguez, one of the men was "blonde" about thirty-four or thirty-five-years-old, tall, robust, white complexion, dark hair, goatee, and had a pock-marked-face, wearing a short-sleeved white t-

("Ms. Ramirez–Rodriguez"), both waitresses at Las Botellas, were inside Las Botellas when they saw the two men enter the bar. (Ex. 9, p. 1; Ex. 4, p. 2; Ex. 10, p. 1). Ms. Ramirez–Rodriguez was eating at the bar when the two men entered. (Ex. 10, p. 1). After he was done sweeping, and after the men entered the bar, Mr. Villarreal–Lopez entered Las Botellas to pick up the beer boxes that were next to the refrigerator. (Ex. 8, p. 1; Ex. 10, p. 1).

When the men entered Las Botellas, they approached the bar counter. (Ex. 9, p. 1). Mr. Villarreal–Lopez asked Ms. Hernandez–Arizaga to "please serve them" because he was putting some beer boxes away. (*Id.*; Ex. 10, p. 1). Ms. Hernandez–Arizaga went behind the counter to serve the two men who asked for two beers.[9] (*Id.*). Ms. Hernandez–Arizaga asked the men what type of beers they wanted, but the man in the white t-shirt[10] responded "whatever."[11] (Ex. 9, p. 1). She gave them two beers. (*Id.*). The man in the white t-shirt then asked her for a lime and cigarettes. (*Id.*). Again, he told her to give him "whatever" brand of cigarettes. (*Id.*). She gave him the cigarettes, and he paid her with a 100–peso bill. (*Id.*). Since she did not have change, she gave the bill to Mr. Villarreal–Lopez who sent Mr. Colunga–Salinas to get change for the bill. (*Id.*). When Mr. Colunga–Salinas returned, he gave Mr. Villarreal–Lopez the money and Mr. Villarreal–Lopez gave it to Ms. Hernandez–

Arizaga. (*Id.*). Ms. Hernandez–Arizaga gave the change to the man in the white t-shirt. (*Id.*). Mr. Colunga–Salinas went out again, and upon his return, she saw the man in the white t-shirt staring at Mr. Colunga–Salinas and talking to his friend. (*Id.*). The men were at the counter for a total of about ten to fifteen minutes. (*Id.*; Ex. 34, p. 3).

While Mr. Villarreal–Lopez was putting the boxes away, Mr. Colunga–Salinas approached Mr. Villarreal–Lopez from behind and told Mr. Villarreal–Lopez that he was going to get change for the jukebox. (Ex. 8, p. 1; Ex. 10, p. 1). Mr. Villarreal–Lopez responded "ok" and then heard a gunshot. (Ex. 8, p. 1). Meanwhile, Ms. Hernandez–Arizaga and Ms. Ramirez–Rodriguez saw the man in the white t-shirt approach Mr. Colunga–Salinas from behind. (Ex. 9, p. 1; Ex. 34, p. 3; Ex. 10, p. 2). The man drew a "black, medium, squared gun from his waist" with his right hand and, without saying anything to Mr. Colunga–Salinas, shot Mr. Colunga–Salinas one time in the head. (*Id.*). Mr. Villarreal–Lopez, who was not facing Mr. Colunga–Salinas, turned around and saw Mr. Colunga–Salinas falling down behind Mr. Villarreal–Lopez. (Ex. 8, p. 1). According to Ms. Hernandez–Arizaga, the man stood there until Mr. Colunga–Salinas fell down. (Ex. 9, p. 1). Ms. Hernandez–Arizaga ducked under the counter and she heard the man in the green jacket, who was still seated on his bar stool next to the

---

shirt and black pants. (Ex. 10 at p. 1). The other man had a dark complexion, was thin, and was wearing a cap, but she did not see him well because she was only able to see his profile. (*Id.*).

9. According to the State Ministerial Police's Informative Report, *Ms. Ramirez–Rodriguez* served the men and the man in the white t-shirt asked *her* for two beers and a pack of cigarettes. (Ex. 4, p. 2).

10. Mr. Villarreal–Lopez, Ms. Hernandez–Arizaga, and Ms. Ramirez–Rodriguez each refer to the alleged shooter as "the man in the white t-shirt." For clarity, the Court will do the same.

11. When Ms. Hernandez–Arizaga was serving the men, she was about one meter away from the men. (Ex. 34, p. 3).

bar, say "we better go, pal." [12] (*Id.*; Ex. 10, p. 2; Ex. 34, p. 3). Ms. Ramirez–Rodriguez "froze" and stayed seated on the stool at the counter. (Ex. 10, p. 2). The men then left the bar.[13]

The Ministerial Police received a telephone call through radio frequency at approximately 2:45–3:00 p.m. (Ex. 1, p. 1; Ex. 4, p. 1). The caller [14] informed the Ministerial Police that a man suffered a fatal wound after being shot in the head at Las Botellas bar. (Ex. 1, p. 1). Consequently, Manuel Montes–Ramirez ("Investigator Montes–Ramirez"), Investigating Prosecutor and Head of the Sixth Public Prosecutor's Office in Nuevo Laredo, along with other officers and the Expert Services Department personnel, went to Las Botellas to collect evidence and interview witnesses.[15] (Ex. 1, p. 1; Ex. 4, p. 1). Upon arrival, Investigator Montes–Ra-

---

**12.** Ms. Hernandez–Arizaga claims that she saw the man wearing the green jacket with the silver crowns at Las Botellas the night before. (Ex. 9, p. 1). On Friday night, he was drinking at the bar with three other men. (*Id.*). She remembered him dancing with another waitress at the bar, Karla Edith Rodriguez–Solis ("Ms. Rodriguez–Solis"). (*Id.*). The man was upset because Ms. Rodriguez–Solis did not play some songs in the jukebox and he went to talk to Mr. Colunga–Salinas. (*Id.*). Mr. Colunga–Salinas told him that if he wanted music, he would have to put coins in the jukebox. (*Id.*). The man left the bar until closing time at dawn. (*Id.*). According to Ms. Hernandez–Arizaga, the man returned to the bar the next day with the man that shot Mr. Colunga–Salinas. (*Id.*). Carmen Johana Arroyo–Cabriales seems to corroborate Ms. Hernandez–Arizaga's claims because Ms. Hernandez–Arizaga allegedly told her that one of the men that participated in the homicide of Mr. Colunga–Salinas was a person with silver crowns in his teeth and that said person was at Las Botellas the night before with other persons. (Ex. 11, p. 2). Ms. Rodriguez–Solis was not at the bar at the time of the murder. (Ex. 12, p. 1). However, according to Ms. Rodriguez–Solis, Ms. Hernandez–Arizaga told Ms. Rodriguez–Solis that Mr. Colunga–Salinas had been shot by a person that had been at the bar the night before and that Ms. Rodriguez–Solis had served him. (*Id.*). Ms. Hernandez–Arizaga told Ms. Rodriguez–Solis that the man had silver crowns in his teeth. (*Id.*). Ms. Rodriguez–Solis remembered the man and described him as being about thirty-eight or forty-years-old, thin, dark-brown skin, regular moustache, and a distinguishing mark of crowns in his four superior teeth, black hair, straight nose, about 1.65 meters tall, or five feet, five inches, wearing "nifty" boots, black denim pants, with a dark-green fabric jacket, denim shirt with buttons with a rooster draw-ing in the middle in black and grey, a black belt, and a black cap with a drawing in the front. (*Id.* at pp. 1–2). She remembered that this man wanted her to play music on the jukebox, but he did not want to pay for the songs. (*Id.* at p. 2). She also recalled that the man became upset because he saw Mr. Colunga–Salinas using the women's restroom. (*Id.*).

**13.** The manner in which the men left Las Botellas is unclear. Mr. Villarreal–Lopez initially claimed that the men ran out of the bar, (Ex. 4, p. 1; Ex. 8, p. 2), but he did not know in what direction. (Ex. 8, p. 2). He later stated that Respondent "got out of the place" and his companion, who was seated at the bar on a bar stool, walked out after him. (Ex. 35, p. 2). According to Ms. Ramirez–Rodriguez, the men took their beer bottles and left the counter. (Ex. 10, p. 2). Ms. Ramirez–Rodriguez was scared, so she looked down and did not see when they left the bar or in what direction they went. (*Id.*). However, Ms. Hernandez–Arizaga claimed that Ms. Ramirez–Rodriguez later told her that the men took the beers and cigarettes and left walking as if nothing had happened. (Ex. 9, p. 1).

**14.** There is no evidence in the record identifying who placed the call to the Ministerial Police.

**15.** According to an Informative Report created by Commanding Officer Jose Antonio Varela–Lopez, the Ministerial Police only interviewed Ms. Arroyo–Cabriales, Mr. Villarreal–Lopez, Mr. Perez–Loredo, and Ms. Ramirez–Rodriguez. (Ex. 4, p. 1–2). However, it appears that Ms. Hernandez–Arizaga, Ms. Rodriguez–Solis, and Reyna Isabel Valladares–Rodriguez were also interviewed on January 8, 2005. (*See* Exs. 9, 12, and 13).

mirez, identified the deceased male as Alfredo Colunga Salinas, who was in charge of Las Botellas and was a bartender at the bar.[16] (Ex. 1, pp. 3–4; Ex. 4, p. 1; Ex. 11, p. 2; Ex. 15, p. 1). There was a "wound in the posterior part of [Mr. Colunga–Salinas's] skull" and a "blood lake around" his head. (Ex. 1 at p. 4). The following items were found near Mr. Colunga–Salinas's body: (1) several beer boxes fifty centimeters northeast of the corpse; (2) a fired 3.80–caliber case next to a white table one meter southeast from his feet; and (3) a 3.80 live projectile fifty centimeters from the corpse. (Id. at pp. 4–5).

Carmen Johana Arroyo–Cabriales, Mr. Colunga–Salinas's common law wife, informed Investigator Montes–Ramirez that two male persons entered the bar and one of them shot Mr. Colunga–Salinas in the head. (Ex. 1, p. 4). Moreover, Mr. Villarreal–Lopez informed Investigator Montes–Ramirez that the Dodge pickup used by the "alleged responsible persons" was in the parking lot adjacent to the bar. (Id. at p. 5). Upon inspection, Investigator Montes–Ramirez discovered the serial number and Texas license plate number of the 2004 black, four-door Dodge pickup truck. (Id.; Ex. 23, p. 1). Investigator Montes–Ramirez also noticed a 3.8 caliber live projectile approximately ten centimeters from the rear wheel on the "western side" of the truck. (Ex. 1, p. 5). The officers took photographs of the vehicle and impounded the Dodge pickup to "the yards of the Ministerial Police." (Id.; Ex. 17; Ex. 32). While searching the Dodge pickup at the impound lot, Investigator Montes–Ramirez found an invoice in the name of "Ery Garcia," issued by Triple J. Express Lube in Laredo, Texas. (Ex. 5, p.

1). Jorge A. Gomez–Lopez, Assistant Expert of the Expert Services Unit, created a sketch of the two men at the bar based on data provided by Ms. Rodriguez–Solis, Ms. Hernandez–Arizaga, and Ms. Ramirez–Rodriguez. (Ex. 14).

In their investigation, the Ministerial Police managed to establish that the Dodge pickup had not been reported stolen. (Ex. 23, p. 1). Rather, the Laredo Police Department ("LPD") traced the vehicle back to Juan Ramon Castillo, Jr. ("Mr. Castillo"), who informed LPD that he sold the vehicle on October 5, 2004, to Respondent. (Id.; Ex. 29, p. 1; Resp. Ex. 16). Although Respondent had not paid Mr. Castillo in full, Mr. Castillo provided the police officers with the sales contract signed by "Buyer" (Mr. Heriberto Garcia) and "Seller" (Mr. Juan R. Castillo) in the presence of a notary public in Laredo, Texas. (Ex. 23, p. 1; Ex. 30; Resp. Ex. 16). Mr. Castillo wanted to ensure that authorities were aware that he had nothing to do with the incident at Las Botellas bar. (Ex. 29, pp. 1–2).

As a result of this information, Jose Antonio Varela Lopez ("Chief Varela–Lopez"), the Group Chief, decided to travel to Laredo to talk directly to Lieutenant Martin Cuellar ("Lt. Cuellar") of DPS's Safety Narcotics Division, who informed Mexican authorities that Respondent and Mr. Castillo were United States citizens. (Ex. 23, p. 1). Lt. Cuellar also informed Chief Varela–Lopez that Respondent had been convicted for possession of narcotics and was currently on parole by the Court. (Id.). Lt. Cuellar further indicated that he was willing to locate Respondent and arrange for Chief Varela–Lopez to talk to

16. Mr. Perez–Loredo, who was still in the parking lot, did not hear any gun shots, he believes, because the music in Las Botellas was usually very loud. (Ex. 7, p. 1). However, after local police patrol units arrived at Las Botellas, Mr. Perez–Loredo realized that the men driving the Dodge pickup left it in the parking lot and did not return to pick it up. (Id. at pp. 1–2).

Respondent directly. (*Id.*). Lt. Cuellar contacted Ranger Sergeant Robert Hunter ("Sgt. Hunter"), also with DPS, to assist in locating Respondent. (Resp. Ex. 16, p. 1). Sgt. Hunter met with Chief Varela–Lopez, among others, and the Mexican officials provided Sgt. Hunter with a summary of their investigation regarding the homicide of Mr. Colunga–Salinas. (*Id.* at pp. 1–2). Chief Varela–Lopez requested that Sgt. Hunter obtain a driver license photograph of Heriberto Garcia and also to make a photo line-up for investigators to show witnesses of the murder. (*Id.* at p. 2). After being compiled by DPS's Special Crimes Analyst Karen Lewis, the photo line-up was given to Chief Varela–Lopez. (*Id.*).

On January 10, 2005, Ranger Victor Escalon ("Ranger Escalon") and Sgt. Hunter were able to locate Respondent at his residence in Laredo, Texas. (*Id.*). Respondent agreed to return to the DPS offices and be interviewed by investigators. (*Id.*). The interview took place that afternoon in Lt. Cuellar's office. (*Id.;* Ex. 23, p. 2). The Mexican officials interviewed Respondent as Ranger Escalon translated and took notes and Sgt. Hunter observed. (Resp. Ex. 16, p. 2). Respondent provided the law enforcement officials present with the following information related to the investigation:

> In the early morning hours of January 8, 2005, Respondent lent his Dodge pick-up to Rafael "Grafita" Martinez ("Mr. Martinez"), a friend of his. Mr. Martinez was born in Monterrey, Nuevo Leon, Mexico, is approximately thirty-five-years-old, of a robust condition, with a fair complexion, dark hair, and a goatee. Mr. Martinez works in Mr. Mar-

tinez's relative's bar in Monterrey, but Respondent did not know the exact location. Respondent met Mr. Martinez about five years prior to the interview in the "zone of tolerance," after which they struck up a "good friendship." Each time Mr. Martinez traveled to Laredo, Mr. Martinez telephoned Respondent, and they met up to "consume alcoholic beverages." On Friday, January 7th, Mr. Martinez visited Respondent because it was Respondent's birthday, and they were going to celebrate by drinking beer. At about 5:00 p.m., the men hired some prostitutes at "Babe's Gentleman's Club," a strip club, located at 8307 San Lorenzo in Laredo, Texas. They took the prostitutes to La Hacienda Hotel on San Bernardo Avenue in Laredo where they rented two rooms (Nos. 206 and 207) at approximately 5:00 a.m. The men then took the two strippers to their car parked at the Circle K on Mines Road and dropped the women off. Mr. Martinez then asked Respondent to lend Mr. Martinez the truck to go buy more beer. Respondent told Mr. Martinez to bring Respondent's vehicle back and not to leave Respondent at the hotel. Mr. Martinez stated that he would return, but Mr. Martinez did not return.[17] On January 9, 2005, Respondent went to the local police station to report his truck stolen from an acquaintance of his from La Hacienda Hotel.[18] The police officers told him he could not report the truck stolen since he had lent it to his friend and, thus, it had not been stolen. In the afternoon of January 9th, local police officers informed him that his

---

**17.** This set of facts is reflected in a report created by Sgt. Hunter. (*Id.*). The report created by Mexican law enforcement indicates that Respondent left with the prostitutes after Mr. Martinez failed to return with Respondent's truck. (Ex. 23, p. 2).

**18.** There is no evidence in the record supporting the time that Respondent attempted to report his truck stolen or which specific station he went to for this purpose.

truck was found in Nuevo Laredo and explained the "situation in which it was found."

(Ex. 23, pp. 2–3; Resp. Ex. 16, p. 2).

Respondent further stated that although he would be willing to make a voluntary statement before the investigating public prosecutor in Nuevo Laredo, he could not because he was on parole and was not able to leave the United States. (Ex. 23, p. 2). According to Respondent, he needed permission from the Court to give a statement in Nuevo Laredo or he would "lose all the benefits of his parole." (*Id.*). Thereafter, Chief Varela–Lopez showed Respondent two composite pictures drawn up by the Expert Services Department based on the data provided by the eyewitnesses of the homicide. (*Id.* at pp. 2–3). Respondent identified the man with the goatee as Rafael Martinez. (*Id.* at p. 3; *see* Ex. 14, p. 3). He also mentioned that he may have a phone number or a picture of Mr. Martinez at his house, but that he would inform the Ministerial Police later if he did. (Ex. 23, p. 3).

On January 11, 2005, Sgt. Hunter contacted Giselle Garcia, the desk clerk at La Hacienda Hotel, to ascertain if Respondent and Mr. Martinez had spent the night there on January 9th. (*Id.*). The desk clerk stated that the manager, Fermin Garcia, would contact Sgt. Hunter regarding his question. (*Id.*). Manager Garcia later contacted Sgt. Hunter and advised that Respondent had checked into the La Hacienda Hotel on January 7, 2005, and rented Room Nos. 206 and 207, and had checked out on January 8, 2005.(*Id.*). According to Manager Garcia, the desk clerk working that night made a Xerox copy of Respondent's driver license. (*Id.*). Manager Garcia provided Sgt. Hunter with a

copy of the room registration card and Respondent's driver license.[19] (*Id.*).

On January 12, 2005, Sgt. Hunter contacted the manager of the Circle K on Mines Road, Mike De La Rosa, who stated that video tapes from their cameras from the night and early morning hours of January 7th and January 8th had already been taped over. (*Id.*). Sgt. Hunter also contacted Circle K clerk, Juan Ibarra, by telephone and asked Ibarra if he had seen Respondent, Mr. Martinez, or the two strippers during the early morning hours of January 8, 2005. (*Id.*). Ibarra stated that he did not recall seeing any of them. (*Id.*).

On January 13, 2005, Chief Varela–Lopez contacted Sgt. Hunter and asked Sgt. Hunter to obtain the correct telephone number and address for Mr. Martinez in Mexico. (*Id.*). Sgt. Hunter contacted Respondent and obtained a telephone number and address in Monterrey, Nuevo Leon, Mexico, for Mr. Martinez. (*Id.*). Chief Varela–Lopez later advised Sgt. Hunter that the number Respondent provided was not a good number for Mexico and that the address was not a correct address for Mr. Martinez. (*Id.*). Chief Varela–Lopez believed that Respondent was lying to officers. (*Id.*).

On January 13th and 17th of 2005, multiple witnesses were asked to appear before the Public Prosecutor's Office in Nuevo Laredo to make a voluntary witness statement. On January 13, 2005, Ms. Rodriguez–Solis, the waitress who saw the man with the silver crowns at Las Botellas the night before Mr. Colunga–Salinas was killed, was shown two pictures: (1) a picture with the name of "Heriberto Garcia" and (2) a picture with the name of "Juan Ramon Castillo, Jr." (Ex. 33, p. 1). Ms. Rodriguez–Solis claimed she did not know

---

**19.** There is nothing in the record to indicate what Sgt. Hunter did with this information.

any of the two males in the pictures and it was the first time she had seen either. (*Id.* at pp. 1–2). She further claimed that neither of the men looked like the person described in her last statement because that man had a dark complexion and silver crowns in his frontal teeth. (*Id.* at p. 2).

Ms. Hernandez–Arizaga, the waitress who served the two men at the bar, made an additional voluntary statement on January 17, 2005, after Ministerial Police officers asked her to appear at the police station to see if she could make a photographic identification. (Ex. 34, p. 1). At the station, two color photos were shown to her: (1) a picture with the name of "Heriberto Garcia" and (2) a picture with the name of "Juan Ramon Castillo, Jr." (*Id.* at p. 2). She then identified the picture with the name "Heriberto Garcia" as the person who shot Mr. Colunga–Salinas. (*Id.* at pp. 1–2). She clarified that Respondent did not have a goatee in the photograph as he had on the day the crime occurred. (*Id.*). She also stated that she did not know the second person and it was the first time she had seen him. (*Id.*). She stated that she served Respondent when he arrived at the bar, he was about one meter away from her for about 10 minutes, and that was why she "saw him perfectly." (*Id.*). She further emphasized that she had no doubt that he is the same person who shot Mr. Colunga–Salinas. (*Id.*).

Mr. Villarreal–Lopez, the Las Botellas employee who was sweeping outside of the bar, made an additional voluntary statement on January 17, 2005, after Ministerial Police officers asked him to appear at the police station so they could show him some pictures to see if Mr. Villarreal–Lopez recognized any of them. (Ex. 35, p. 1). Once he was at the police station, two color pictures were shown to him. (*Id.* at p. 2). The first of the photographs had the name "Heriberto Garcia" on the top left corner. (*Id.*). The second picture was of a person named "Juan Ramon Castillo, Jr." (*Id.*).

According to Mr. Villarreal–Lopez, he immediately recognized "Heriberto Garcia" as one of the two persons he mentioned in his January 8th statement who, at approximately 2:00 p.m., was next to the black pickup truck that was parked in the "private road" next to the bar where he worked. (*Id.*). Respondent was about twenty meters away from where Mr. Villarreal–Lopez was sweeping outside of the bar, and Mr. Villarreal–Lopez saw him "face to face." (*Id.*). Mr. Villarreal–Lopez stated that Respondent had a goatee beard at that time, which he did not have in the picture. (*Id.* at pp. 2–3). Mr. Villarreal–Lopez claimed to have never seen Mr. Castillo. (*Id.* at p. 2).

He also recognized him as the person Ms. Hernandez–Arizaga served at the bar when Mr. Villarreal–Lopez was putting away the beer cartons. (*Id.* at p. 2). He remembered that Respondent was wearing a short sleeved t-shirt, black pants, and brown boots on January 8th. (*Id.*). When asked whether he knew for a fact that Respondent shot Mr. Colunga–Salinas, he responded that he did "not know for a fact," but he believed Respondent did shoot Mr. Colunga–Salinas. (*Id.*). According to Mr. Villarreal–Lopez, when Mr. Villarreal–Lopez was putting the beer cartons away, Mr. Colunga–Salinas was behind Mr. Villarreal–Lopez and, all of a sudden, Mr. Villarreal–Lopez heard a "detonation." (*Id.*). When Mr. Villarreal–Lopez turned around, he noticed Mr. Colunga–Salinas had fallen down. (*Id.*). Mr. Villarreal–Lopez saw that Mr. Colunga–Salinas was bleeding from his head and that Respondent was standing behind Mr. Colunga–Salinas. (*Id.*).

On January 17, 2005, Mr. Perez–Loredo, the parking lot attendant, gave an addi-

tional informative statement. (Ex. 36). The Ministerial Police went to his house and asked him to appear in the police station to show him pictures and to see if he could identify any of them. (*Id.* at p. 1). Once at the station, the Investigating Prosecutor showed Mr. Perez–Loredo two color pictures of two males. (*Id.*). The name "Heriberto Garcia" appeared on the top left corner of the first picture, and in the second picture was a person named "Juan Ramon Castillo, Jr." (*Id.* at p. 2). He recognized "Heriberto Garcia" as the person who was driving the black pickup truck that was left in the parking lot where he worked on January 8, 2005.(*Id.*). He did not recognize Mr. Castillo. (*Id.*).

According to Mr. Perez–Loredo, Respondent exited the black pickup and Mr. Perez–Loredo "saw him well." (*Id.* at p. 2). Respondent then told Mr. Perez–Loredo "take care of the van, do not let anybody make a scratch," when they were outside Las Botellas bar. (*Id.*). When Mr. Perez–Loredo saw him on January 8th, Respondent had a goatee beard, and Mr. Perez–Loredo recognized the freckles on Respondent's face. (*Id.*). Mr. Perez–Loredo recalled that Respondent wore dark blue jeans, a white t-shirt and a dark-colored jacket. (*Id.*).

Mr. Perez–Loredo further stated that he saw Respondent twice on January 8th. First, when he parked the black truck and left. (*Id.* at p. 3). Then, when Respondent came back about two hours later and he and his companion were standing outside of the pickup truck for about fifteen minutes, but Mr. Perez–Loredo could not see what they were doing. (*Id.*). Mr. Perez–Loredo walked toward Respondent, but he told Mr. Perez–Loredo "not yet,"

and Mr. Perez–Loredo did not get close to the men. (*Id.*). When asked whether he saw Mr. Villarreal–Lopez on January 8th, Mr. Perez–Loredo responded yes, that he saw him doing the "donkey work," that is, cleaning. (*Id.*). According to Mr. Perez–Loredo, Mr. Villarreal–Lopez was sweeping on the street outside Las Botellas since Las Botellas opened at noon that day. (*Id.*).

On January 18, 2005, Chief Varela–Lopez contacted Sgt. Hunter and advised him that the Tamaulipas State Homicide Police had shown five of the witnesses the driver license photograph of Respondent provided by Sgt. Hunter, and they had all positively identified Respondent as the person who shot and killed Mr. Colunga–Salinas.[20] (Resp. Ex. 16, p. 3). Chief Varela–Lopez stated that the Tamaulipas State Homicide Police were attempting to obtain a warrant for the arrest of Heriberto Garcia for the murder of Mr. Colunga–Salinas. (*Id.*).

On January 19, 2005, Investigator Montes–Ramirez issued his findings that Heriberto Garcia was the "probable responsible for the commission of the crime of **HOMICIDE,** committed to the harm of the person who during the lifetime was named **ALFREDO COLUNGA SALINAS alias EL CHOLO.**" (Ex. 37, p. 1 (emphasis in original)). As part of his findings, Investigator Montes–Ramirez summarized the evidence gathered as part of law enforcement's investigation and attached the witness statements. (Ex. 37). These findings were submitted to the First Criminal Trial Judge of the Third State Judicial District in Nuevo Laredo, Tamaulipas, in order to request the issuance of an arrest warrant for Respondent. (*Id.* at p. 27). On January 24, 2005, Judge Jose Jaime

---

**20.** As detailed above, only four witness statements were provided in the Government's documentary evidence. Furthermore, only three of the four witnesses positively identi-

fied Respondent. Notably, only Ms. Hernandez–Arizaga was able to definitively state that Respondent was the person who shot and killed Mr. Colunga–Salinas.

Palacios–Salinas issued an arrest warrant for Respondent after he determined that there was "[c]ircumstantial evidence leading [him] to the strong conviction of making probable [Heriberto Garcia's] responsibility for the commission of the crime of homicide." (Ex. 39, p. 10).

On February 14, 2005, Respondent called Sgt. Hunter requesting that Respondent and Sgt. Hunter meet at the DPS District Office later that afternoon. (Resp. Ex. 16, p. 7). Sgt. Hunter agreed to meet with Respondent at 3:30 p.m. (*Id.*). When Sgt. Hunter and Respondent met, Sgt. Hunter observed that Respondent was "very agitated, nervous, and [he] could hardly sit still." (*Id.*). Respondent stated that Chief Varela–Lopez told the Nuevo Laredo newspaper, El Diario, that Respondent was wanted for murder in Mexico and there was a warrant out for Respondent's arrest. (*Id.* at pp. 7–8). Respondent further stated that El Diario printed Respondent's Texas address in the article. (*Id.* at p. 8). According to Respondent, the victim in the murder in Nuevo Laredo, Mr. Colunga–Salinas, was part of the "Los Zetas" drug smuggling organization. (*Id.*). Respondent further informed Sgt. Hunter that he believed "Los Zetas" were attempting to kill Respondent or harm Respondent's family. (*Id.*). Respondent claimed his wife had observed a green Chevrolet Suburban with Tamaulipas, Mexico license places following her around Laredo. (*Id.*).

On February 16, 2005, Sgt. Hunter contacted United States Probation Supervisor Joann Brooks, Respondent's U.S. Probation Officer Lloyd Soto, and U.S. Probation Officer Sam Brewster. (*Id.*). Sgt. Hunter was advised that Respondent was currently in the federal halfway house located in Laredo, Texas, and was allowed to work during the day and locked up at night. (*Id.*). Supervisor Brooks advised

Sgt. Hunter that she believed that Respondent would be released from the halfway house and placed on an electronic monitoring system because of the possible threat from "Los Zetas." (*Id.*).

## IV. DISCUSSION

 Extradition treaties create a binding obligation on the United States Government to surrender fugitives to its treaty partners once they are found to be extraditable. *See Wright v. Henkel,* 190 U.S. 40, 62, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *see also Allen v. Schultz,* 713 F.2d 105, 107–108 (5th Cir.1983); Extradition Treaty, U.S.-Mex., art. 13, ¶ 3, May 4, 1978, 31 U.S.T. 5059. Foreign extradition is *sui generis* in nature, neither civil nor criminal, and is controlled by a self-contained body of law. *See United States v. Doherty,* 786 F.2d 491, 498 n. 9 (2d Cir. 1986) (citing multiple circuit court cases); *In re Extradition of Nava Gonzalez,* 305 F.Supp.2d 682, 689 (S.D.Tex.2004); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969) ("[T]he procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.").

 As discussed above, a potential extraditee is entitled to a hearing before a judge so "that the evidence of criminality may be heard and considered." *See* 18 U.S.C. § 3184. At the hearing, the presiding judge is not required to make a determination of guilt or innocence. *See* Extradition Treaty, U.S.-Mex., art. 3, May 4, 1978, 31 U.S.T. 5059. Rather, the purpose of an extradition hearing is to provide a judicial determination that extradition is proper under the circumstances. A request for extradition should be granted if the following findings are made: (1) the judicial officer has jurisdiction to conduct an extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the

person before the Court is the fugitive named in the request for extradition; [21] (4) there is an extradition treaty in full force and effect; (5) the crimes for which surrender is requested are covered by that treaty; and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought.

## A. Jurisdiction

The statute governing extradition proceedings authorizes a broad class of judicial officers to hear extradition cases. *See* 18 U.S.C. § 3184. Federal magistrate judges are expressly authorized to hear and decide extradition cases if "authorized to do so by a court of the United States." *In re Extradition of Ramos Herrera*, 268 F.Supp.2d 688, 693 (W.D.Tex.2003) (citing 18 U.S.C. § 3184). Under General Order 2002–13, addressing the authority of magistrate judges in the Southern District of Texas, "[a] magistrate judge is authorized to handle all matters pertaining to extradition complaints filed pursuant to 18 U.S.C. § 3184."

The extradition statute further provides that jurisdiction will apply to any person found within the jurisdiction of the court. 18 U.S.C. § 3184. Respondent was initially found, and is now in federal custody, within the jurisdiction of the Southern District of Texas. Thus, the Court has the requisite personal jurisdiction to make a determination on whether Respondent is extraditable pursuant to 18 U.S.C. § 3184. Respondent does not dispute this Court's jurisdiction over the extradition proceeding or over his person.

## B. Existence of an Extradition Treaty

The Government has submitted a declaration from Gregory B. Wierzynski, who is an "Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C." dated November 11, 2007, which verifies that the Treaty between the United States and Mexico was signed on May 4, 1978, and is presently in full force and effect. A copy of the Treaty is attached to the declaration. Respondent does not contest that an extradition treaty between the United States and Mexico is in full force and effect.

## C. Is Charged Offense Covered by the Extradition Treaty?

Under 18 U.S.C. § 3184, extradition will be considered where there is a sworn complaint charging the fugitive with a crime provided for in the Treaty. In accordance with the principle of "dual criminality, the act on which the extradition request is founded must be considered a crime in both jurisdictions." *Nava Gonzalez*, 305 F.Supp.2d at 689–90 (citation omitted); *see United States v. Ramnath*, 533 F.Supp.2d 662, 673 (E.D.Tex.2008). More specifically, if the offense for which the government of Mexico seeks to prosecute is included within the Appendix to the treaty, the offense must be punishable in both the United States and Mexico "by deprivation of liberty[,] the maximum of which shall not be less than one year" to qualify as an extraditable offense. Extradition Treaty, U.S.-Mex., art. 2, ¶ 1, May 4, 1978, 31 U.S.T. 5059. "[T]he determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested country." *In re Extradition of Cervantes Valles*, 268 F.Supp.2d 758, 770 (S.D.Tex.2003) (citation omitted).

Here, the offense of murder is included within the Appendix to the extradition.

---

21. Respondent does not challenge that he is the "Heriberto Garcia" being sought by the Mexican government for the murder of Mr. Colunga–Salinas.

Extradition Treaty, U.S.-Mex., Appendix, May 4, 1978, 31 U.S.T. 5059. Moreover, pursuant to Article 337 of the Criminal Code for the State of Tamaulipas, homicide is punishable by "an imprisonment penalty ranging from twenty to fifty years." (Ex. 40, p. 5). Murder is also a felony offense under both federal law and the laws of Texas and punishable by more than one year imprisonment.[22] 18 U.S.C. § 1111; Tex. Penal Code §§ 12.32 and 19.02.

Furthermore, Mr. Wierzynski declares that "[the] offenses for which extradition is sought are punishable in accordance with the laws of both contracting parties ... and are covered under Article 2 of the 1978 Extradition Treaty between the United States of America and Mexico." Mr. Wierzynski's uncontested opinion provides substantial evidence of dual criminality. *See In re Extradition of Salazar*, 2010 WL 2925444, at *4 (S.D.Cal. July 23, 2010) (citing *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) (opinion of State Department on whether a crime is covered by a treaty is entitled to weight and deference)). The Court notes that Respondent does not dispute that the charged offense of homicide is covered by the Treaty. As such, homicide is an extraditable offense under the treaty. *See Cervantes Valles*, 268 F.Supp.2d at 771.

**D. Does the Evidence Justify Commitment for Trial in Mexico?**

■■■ The Court may grant the extradition request only if the evidence is found sufficient, under the laws of the United States, to justify the committal for trial. Extradition Treaty, U.S.-Mex., art. 3, ¶ 1, May 4, 1978, 31 U.S.T. 5059. Under 18 U.S.C. § 3184, the Court is charged with determining whether the "evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." *Cervantes Valles*, 268 F.Supp.2d at 771 (citation omitted). In the United States, evidence that is sufficient to sustain the charge requires a showing of "probable cause." *See Ntakirutimana*, 184 F.3d at 427; *Cervantes Valles*, 268 F.Supp.2d at 772 (citation omitted). In international extradition cases, courts apply the federal standard of probable cause. *Ramnath*, 533 F.Supp.2d at 679 (citing *Garcia–Guillern*, 450 F.2d at 1192; *Jimenez v. Aristeguieta*, 311 F.2d 547, 562 (5th Cir.1962)).

■■■ The Government is not required to present evidence sufficient to convict. *Ramnath*, 533 F.Supp.2d at 679 (citing *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922)). Rather, "probable cause" is the existence of reasonable grounds to believe the accused committed the charged offense. *Sayne*, 418 F.2d at 685; *Cervantes Valles*, 268 F.Supp.2d at 772 (citation omitted). The law thus requires evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *Cervantes Valles*, 268 F.Supp.2d at 772; *Nava Gonzalez*, 305 F.Supp.2d at 691. "In making this determination, courts apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime." *Rodriguez Ortiz*, 444 F.Supp.2d at 884 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (internal quotations omitted).

---

**22.** "Dual criminality is generally measured by comparing the charged offense to conduct proscribed by federal law, the law of the asylum state, or the laws of a preponderance of states." *In re Extradition of Diaz Medina*, 210 F.Supp.2d 813, 816 n. 2 (N.D.Tex.2002) (citing *In re Extradition of Prushinowski*, 574 F.Supp. 1439, 1446 (E.D.N.C.1983)).

■ Notably, the extradition hearing is akin to a preliminary hearing under Federal Rule of Criminal Procedure 5.1, and is not a trial on the merits to determine whether the accused is guilty or innocent of the underlying criminal allegations. *See Escobedo*, 623 F.2d at 1102 n. 5 (citing *Sayne*, 418 F.2d at 685); *see also Cervantes Valles*, 268 F.Supp.2d at 772; *Nava Gonzalez*, 305 F.Supp.2d at 691. At the hearing, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure do not apply. *See In re Extradition of Diaz Medina*, 210 F.Supp.2d 813, 815 (N.D.Tex.2002) (citing Fed.R.Evid. 1101(d)(3) and Fed. R.Crim. Proc. 54(b)(5), moved to Rule (a)(5)(A)); *see also Sayne*, 418 F.2d at 685 ("Unique rules of 'wide latitude' govern reception of evidence in Section 3184 hearings."). "[P]rocedurally, [this] appears to make for a broad hearing. Substantively, however, the scope of the hearing is very limited as to matters raised by Respondent." *Cervantes Valles*, 268 F.Supp.2d at 772 (*citing In re Extradition of Contreras*, 800 F.Supp. 1462, 1464 (S.D.Tex.1992)).

■ Specifically, under the general rule of non-contradiction in foreign extradition cases, evidence explaining away or completely rebutting the existence of probable cause appears to be the only admissible evidence which Respondent can present at the probable cause hearing. *Id.* (citing *Contreras*, 800 F.Supp. at 1464); *see Garza v. United States*, 180 Fed.Appx. 522, 523 (5th Cir.2006) (holding that it was not erroneous for committing court to refuse to admit an affidavit from a private investigator that provided evidence of a witness's lack of credibility when "the affidavit would not have explained away the witness's testimony, but only challenged its credibility"). Although courts have struggled to clarify the distinction between admissible "explanatory" evidence and inadmissible "contradictory" evidence, Fifth Circuit district courts have held that "evidence of [a] ... defense is admissible if it negates or obliterates probable cause, but not if it merely controverts the evidence of the requesting country." *In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 739 (W.D.La.1999); *Cervantes Valles*, 268 F.Supp.2d at 772. The Court in *Matter of Sindona* discussed the difference between "explanatory" and "contradictory" evidence:

> The distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence," the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

450 F.Supp. 672, 685 (S.D.N.Y.1978).

Consequently, an extradition hearing is not a trial and to allow it to become one "would defeat the whole object of extradition." *Sayne*, 418 F.2d at 685 (quoting *Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911)) (internal quotations omitted); *see Gill v. Imundi*, 747 F.Supp. 1028, 1040 (S.D.N.Y.1990) (stating that although the distinction between "contradictory" and "explanatory" evidence is "difficult to articulate," it "becomes less wooden when its purpose of preventing a full-scale trial, involving witnesses telling competing stories, is contemplated"). Thus, "[m]atters of defense are not appropriate or relevant because the function of the hearing judge is to deter-

mine only whether there is competent evidence to justify holding the accused for trial, not whether the evidence is sufficient to sustain a conviction." *Diaz Medina,* 210 F.Supp.2d at 818. More importantly, "[e]xtradition judges are not expected to decide conflicting factual claims between the Government and the accused." *Ramos Herrera,* 268 F.Supp.2d at 696.

■ Furthermore, "[w]hen a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient [or sufficient] indicia of reliability or credibility to establish probable cause." *In re Extradition of Singh,* 124 F.R.D. 571, 577 (D.N.J.1987); *Eain v. Wilkes,* 641 F.2d 504, 509–11 (7th Cir.1981) (finding the affidavits of an accomplice, corroborated by the affidavits of a police officer and a second civilian witness sufficient to establish probable cause). Indeed, the Supreme Court has found that extradition may be predicated entirely on the "unsworn statements of absent witnesses." *Collins,* 259 U.S. at 317, 42 S.Ct. 469. "The admission and evaluation of evidence in extradition proceedings is committed to the sound discretion of the court." *Gonzalez,* 52 F.Supp.2d at 737 (citing *Collins,* 259 U.S. at 316, 42 S.Ct. 469).

### 1. Alibi evidence

■ Generally, an accused cannot introduce evidence in the nature of an alibi defense. *Sayne,* 418 F.2d at 685 (citations omitted). Consistent with the general rule of non-contradiction, when alibi evidence would raise more questions than answers and turn the probable cause determination into a full trial on the merits, it does not obliterate probable cause. Further, even if the Court allows Respondent to offer and admit alibi evidence, it can exclude such evidence from consideration after ad-mission. *See Gonzalez,* 52 F.Supp.2d at 739 (citing multiple cases where alibi evidence was offered but either not admitted or excluded after admission).

■ Here, Respondent's counsel argues that there is alibi evidence to indicate that probable cause does not exist. (Extradition Hearing at 2:03:40). In support of his argument, Respondent cites to a Report from DPS's Texas Ranger Division. (Resp. Ex. 16). This report describes an interview in which Respondent advised Sgt. Hunter, along with Mexican law enforcement officials, that he was with a friend and two prostitutes at La Hacienda Hotel in the early morning hours of January 8, 2005, the day Mr. Colunga–Salinas was killed in Mexico. (*Id.* at p. 2). According to Respondent, his friend—Mr. Martinez—borrowed his pick-up truck that morning and never returned it. (*Id.*). As part of his investigation, Sgt. Hunter confirmed with the manager of La Hacienda Hotel that Respondent did check in to Rooms 206 and 207 the evening of January 7, 2005, and checked out on January 8, 2005. (*Id.* at p. 3).

Furthermore, Sgt. Hunter contacted the manager and the clerk of the Circle K where Respondent claimed to have dropped off the prostitutes. (*Id.*). The manager advised Sgt. Hunter that the video tapes from their cameras the night of January 7th and the morning of January 8th had already been taped over. (*Id.*). The clerk did not recall seeing Respondent, Respondent's alleged companion who stole Respondent's truck, or the two prostitutes during the early morning hours of January 8, 2005.(*Id.*).

The argument of the existence of an alibi introduced at the extradition hearing by Respondent's counsel is Respondent's attempt to "explain away" the evidence of probable cause against him. Evidence that tends to establish an alibi is evidence

"that the [accused] was not present at the time or at the place where the [accused] is alleged to have committed the offense charged...." *United States v. Brown*, 49 F.3d 135, 137 (5th Cir.1995); *see* BLACK'S LAW DICTIONARY 84 (9th ed. 2009) (an alibi is a "defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time"). Definitive evidence of an alibi conclusively placing Respondent in a location other than Las Botellas bar at the time the crime occurred could be sufficient to obliterate probable cause. *See Gonzalez*, 52 F.Supp.2d at 738–41 (holding that respondents had "presented credible and persuasive [alibi] evidence that they were elsewhere on the date of the robbery and could not have perpetrated this crime" and that such evidence is admissible when it "negates" the existence of probable cause).

Here, however, the evidence merely shows what Respondent told law enforcement when he was questioned about Mr. Colunga–Salinas's murder and what steps or follow-up investigation was undertaken to corroborate Respondent's story. More importantly, the report indicates that law enforcement was unable to corroborate most of Respondent's assertions. In fact, the investigation only corroborated that Respondent checked into two rooms at the La Hacienda Hotel. However, Respondent checked into the rooms on the evening of January 7, 2005, instead of, around 5:00 a.m. on January 8, 2005 as Respondent claimed. The report also reflects that law enforcement could not corroborate, during the time in question, (1) that Respondent was with a Mr. Martinez; (2) that Respondent was socializing with two females or prostitutes that evening; or (3) that Respondent's vehicle was actually borrowed or stolen.

Interestingly, although Respondent claims that Mr. Martinez left him at the hotel in the early morning hours of January 8th, except for the inference that he never left the United States, Respondent fails to provide any evidence of his whereabouts between the hours of 11:15 a.m. and 3:00 p.m.[23] Further, when questioned by law enforcement, the reports do not indicate that Respondent ever explained anything specific about his whereabouts between the hours of 11:15 a.m. and 3:00 p.m. In other words, other than Respondent's unsworn statements to law enforcement, there is no other evidence in the record that indicates his whereabouts during the relevant time-frame of Mr. Colunga–Salinas's murder. This is not definitive evidence conclusively placing Respondent in a location other than the Las Botellas bar at the time of the crime. When reviewing this evidence, it definitely raises more questions than answers for the Court. As such, this is not credible and persuasive evidence that would obliterate probable cause.

### 2. Eyewitness identifications

Respondent advances several arguments to call into question the reliability of the eyewitness identifications. First, Respondent argues that the Court should carefully read the witness statements identifying Respondent because the statements are not signed by the witnesses themselves, but by the prosecuting attorney. Respondent further argues that each of the statements contains the following boilerplate language, "I fully recognize and without fear to make a mistake the person who appears in the first picture which is shown to me which it appears the same Heriberto Garcia...." According to Respondent, the Mexican prosecutor merely wrote out the three witness statements

**23.** Respondent did not testify at the extradi- tion hearing.

identifying Respondent and added all the adjectives and adverbs that he thought should apply to the identification. Respondent asserts that this is a circumstance where the lawyer asked the question and wrote the answer, and then the witness adopted the answer. Respondent further argues that the statements were signed by the prosecuting attorney, but never signed by the witnesses.

However, even assuming that the statements were written and signed by the Mexican prosecutor, this does not make the statements unreliable for purposes of determining probable cause. "[A] prosecutor's or an officer's summary of hearsay statements by affidavit is competent evidence sufficient for a finding of extraditability as long as the affidavit is authenticated." *In re Surrender of Ntakirutimana,* 1998 WL 655708, at *25 (S.D.Tex. Aug. 6, 1998) (citing *Emami v. United States Dist. Ct. for the N. Dist. of Cal.,* 834 F.2d 1444, 1451 (9th Cir.1987)); *see Bovio v. United States,* 989 F.2d 255, 259–61 (7th Cir.1993) (finding a Swedish investigator's affidavit sufficient to establish probable cause). Consequently, this argument has no merit.

 Second, Respondent notes that even though a photograph of Respondent is included in Government Exhibit 24, there is no evidence in the record to know whether Exhibit 24 was the photograph shown to the witnesses. Nonetheless, for purposes of determining the existence of probable cause, there is enough evidence in the record to infer that Exhibit 24 was, in fact, the photograph shown to the witnesses.

According to Sgt. Hunter's report, Chief Varela–Lopez requested a copy of Respondent's driver license photograph. (Resp. Ex. 16, p. 2). The photograph in Exhibit 24 of the Government's supporting documents appears to have been provided by DPS as indicated by the web address at the bottom of Exhibit 24, *https://www.texasonline. state.tx.us/NASApp/txdps/DPSImage Manager.* Moreover, in the center of Exhibit 24 is the following admonishment to users of the website: "OFFICIAL LAW ENFORCEMENT USE ONLY. Violations subject to civil and criminal penalties and termination of access." Consistent with the identification statements provided by Mr. Villarreal–Lopez and Mr. Perez–Loredo, the name "Garcia, Heriberto" appears at the upper left-hand corner of Exhibit 24. Thus, it is unlikely that a photograph other than the photograph provided by DPS to Chief Varela–Lopez was shown to the identifying witnesses by Mexican law enforcement.

Furthermore, the witness statements provided by the Mexican Government specifically indicate that Ms. Hernandez–Arizaga, Mr. Villarreal–Lopez, and Mr. Perez–Loredo each identified Respondent from a photograph under oath. (*See* Dkt. No. 19, pp. 18–19). At this juncture, there is no reason to doubt the Mexican Government's representation that each of the witnesses was shown a photograph of Respondent. Respondent's argument speculating that a different photograph may have been used with the witness identifications, with no evidentiary support, is merely an argument that attempts to contradict the Mexican Government's evidence, and not one that completely obliterates a probable cause finding.

 Third, Respondent argues that the procedures employed by Mexican authorities in the photo identification process were significantly flawed. Generally, "[c]ompetent evidence to establish reasonable grounds [to extradite] is not necessarily evidence competent to convict." *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Jimenez,* 311 F.2d at 562 (citation omitted). Com-

petent legal evidence is simply that evidence which the presiding judicial officer deems sufficiently reliable to properly consider. *Quinn v. Robinson,* 783 F.2d 776, 815–16 (9th Cir.1986). Notably, "there exists no rule specifying which identification procedures are competent for use in extradition proceedings, and such evidence need not be rejected merely because United States procedures governing the admissibility of an identification at trial were not followed." *Cervantes Valles,* 268 F.Supp.2d at 773 (citing 31A Am. Jur. 2d Extradition § 104). Nonetheless, the identification evidence must be both sufficiently reliable and competent for purposes of determining probable cause.

The Court recognizes that there is a "possibility of misidentification by the eyewitnesses, given the fact that both the psychological and legal communities have recognized that there are, in general, well-known flaws with eyewitness identification evidence." *Cervantes Valles,* 268 F.Supp.2d at 773 (citation omitted). Thus, in domestic criminal cases, "[t]he Fifth Amendment Due Process Clause prohibits identification testimony that derives from impermissibly suggestive procedures that may lead to an irreparably mistaken identification." *Gonzalez,* 52 F.Supp.2d at 737 (citing *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). In a domestic criminal case, a two-step analysis is employed to determine whether the district court erred in admitting identification evidence. *United States v. Burbridge,* 252 F.3d 775, 780 (5th Cir.2001). District courts in the Fifth Circuit have applied this two-step analysis in aiding their probable cause analysis in foreign extradition cases. *See, e.g., Cer-*

*vantes Valles,* 268 F.Supp.2d at 773–74; *Gonzalez,* 52 F.Supp.2d at 737–38. Bearing in mind that the properly authenticated documentary evidence proffered by the Government is deemed admitted, the Court will apply the two-step analysis, not to determine the admissibility of the identification evidence, but to analyze its weight and reliability.

#### a. Step One: Were the identification procedures impermissibly suggestive?

■ The Court must first determine whether the identification procedures were impermissibly suggestive. *Cervantes Valles,* 268 F.Supp.2d at 773 (citing *Burbridge,* 252 F.3d at 780). It is well-established that a single-photo array is considered one of the most suggestive identification procedures and is to be viewed with suspicion. *United States v. Sanchez,* 988 F.2d 1384, 1389 (5th Cir.1993) (citing *Manson v. Brathwaite,* 432 U.S. 98, 108–9, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Here, however, each of the identifying witnesses was shown a total of two photographs: (1) Respondent's photograph, and (2) a photograph of Mr. Castillo, the former owner of Respondent's Dodge pickup truck. There is no evidence in the record describing the specific identification procedures employed by Mexican authorities during the witness identifications. Given the number of photographs shown to the witnesses and the lack of clarification on how the two photographs were presented to the eyewitnesses, the Court recognizes that merely showing two photographs in the identification process was impermissibly suggestive.[24] *See United States v.*

---

24. Notably, each witness described Mr. Colunga–Salinas's shooter as having a "fair complexion." Thus, it is possible that the photo identifications could have been even more suggestive if Respondent appeared to have a fair complexion in his photo while Mr.

Castillo appeared to have darker skin in his photo. However, it is difficult for the Court to ascertain the appearance of Respondent's and Mr. Castillo's skin tone when the photographs provided to the Court were merely

*Cueto,* 611 F.2d 1056, 1063–64 (5th Cir. 1980) (upholding district court's determination that the showing of two photographs was impermissibly suggestive); *see also Hudson v. Blackburn,* 601 F.2d 785, 788 (5th Cir.1979) (same); *c.f. United States v. Diecidue,* 603 F.2d 535, 565 (5th Cir.1979) (photographic display of seven different individuals held not suggestive for identification of single defendant).

### b. *Step Two: Are the identifications independently reliable?*

 Since the eyewitness identification procedures were impermissibly suggestive, the Court must now determine whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification by the eyewitnesses. *Cervantes Valles,* 268 F.Supp.2d at 774 (citing *Burbridge,* 252 F.3d at 780). Put simply, the second step requires the Court to determine whether the identification is independently reliable, notwithstanding the impermissibly suggestive eyewitness photo identification. *United States v. Honer,* 225 F.3d 549, 553 (5th Cir.2000). The factors to be considered in evaluating the reliability of the identification and the likelihood of misidentification include the following: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the degree of attention paid by the witness; (3) the accuracy of the prior description of the criminal given by the witness; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The first witness, Ms. Hernandez–Arizaga, the waitress who served the two men at the bar, provided a sworn statement to Mexican law enforcement on January 17, 2005, nine days after the shooting, specifically identifying Respondent as the shooter who killed Mr. Colunga–Salinas. (Ex. 34). At the police station, she stated that she served Respondent when he arrived at the bar, he was about one meter away from her for about 10 minutes, and that was why she "saw him perfectly." (*Id.* at p. 3). She further emphasized that she had no doubt that he is the same person who shot Mr. Colunga–Salinas. (*Id.*). Ms. Hernandez–Arizaga also clarified that Respondent did not have a goatee in the photograph as he had on the day the crime occurred. (Ex. 34, p. 1). In her previous sworn statement provided the day of the shooting, Ms. Hernandez–Arizaga described the shooter as being about thirty-years old, tall, fair complexion, robust, black hair, with a goatee. (Ex. 9, p. 1). Notably, Respondent was thirty-one-years-old on January 8th, the day of the shooting.

Applying the relevant factors, Ms. Hernandez–Arizaga's, who was able to: (1) view the assailant at the time he pulled the trigger; (2) observe the assailant from about one meter away for approximately ten minutes prior to the commission of the crime while she served him and his companion; (3) provide a description of the assailant that is consistent with Respondent's age and height, (*see* Ex. 24); (4) appear to be certain of her photographic identification of Respondent as the gunman; and (5) identify Respondent's photograph nine days after the shooting occurred.

The second witness, Mr. Villarreal–Lopez provided a sworn statement to Mexican authorities on January 17, 2005, nine days after the shooting, stating that he saw "Heriberto Garcia" on January 8th outside Las Botellas bar when Mr. Villar-

black and white photocopies of each of their photographs. (*See* Dkt. Nos. 24 and 27).

real–Lopez was sweeping outside the bar. (Ex. 35). According to Mr. Villarreal–Lopez, he immediately recognized Respondent as one of the two persons he mentioned in his January 8th statement who was next to the black pickup that was parked in the "private road" next to Las Botellas. (*Id.* at p. 2). He further indicated that when he saw Respondent standing outside of the black pickup, Respondent was about twenty meters away from where he was sweeping and he saw Respondent "face to face." (*Id.*). He also recognized him as the person who Ms. Hernandez–Arizaga served at the bar when Mr. Villarreal–Lopez was putting away the beer cartons. (*Id.*).

Although Mr. Villarreal–Lopez did "not know for a fact" that Respondent shot Mr. Colunga–Salinas because he did not actually observe Respondent pull the trigger, he believed Respondent was the triggerman because Respondent was standing behind Mr. Colunga–Salinas immediately after the shooting. (*Id.*). In his previous statement, Mr. Villarreal–Lopez described the man he believes shot Mr. Colunga–Salinas as being about thirty-five-years-old, tall, robust, fair complexion, black hair, with a goatee. (Ex. 8, p. 1). At that time, Mr. Villarreal–Lopez said, Respondent had a goatee beard which he did not have in the picture presented to him. (Ex. 35, pp. 1–2).

Applying the relevant factors, Mr. Villarreal–Lopez was able to: (1) observe the assailant twice, once when the assailant was standing outside of the pickup truck at the parking lot next to Las Botellas, and for a second time, inside the bar, when Ms. Hernandez–Arizaga served the assailant and after he saw the assailant standing behind the recently-shot victim; (2) see the assailant "face to face;" (3) provide a description of the assailant that is consistent with Respondent's age and height,

(*see* Ex. 24); (4) appear confident of his photographic identification of Respondent as the person he believed to be the shooter; and (5) identify Respondent's photograph nine days after the shooting occurred.

The third witness, Mr. Perez–Loredo provided a sworn statement to Mexican authorities on January 17, 2005, nine days after the shooting, stating that he saw "Heriberto Garcia" on January 8th at the parking lot outside Las Botellas bar when Mr. Perez–Loredo was working as the parking lot attendant. (Ex. 36). He recognized Respondent as the person who was driving the black pickup that was left in the parking lot that day. (*Id.* at p. 2). Mr. Perez–Loredo stated that he saw Respondent twice on January 8th. First, he saw Respondent when Respondent parked the black truck and told Mr. Perez–Loredo "take care of my van." (*Id.* at p. 3). According to Mr. Perez–Loredo, when Respondent exited the black pickup, Mr. Perez–Loredo "saw him well." (*Id.* at p. 2). Mr. Perez–Loredo saw Respondent a second time when Respondent and his companion came back about two hours later and both of them stood outside of the pickup for about fifteen minutes. (*Id.* at p. 3). At that time, Mr. Perez–Loredo walked towards Respondent, but Respondent told him "not yet" and Mr. Perez–Loredo did not get close to the men at that time. (*Id.*).

In Mr. Perez–Loredo's January 8th statement, he described Respondent as being tall (approximately 1.8 meters, or five feet, eleven inches), robust, with a fair complexion, black hair, and no moustache. (Ex. 4, p. 2; Ex. 7, p. 1). While Mr. Perez–Loredo did not provide a complete description of Respondent in his January 17th statement, Mr. Perez–Loredo asserted that Respondent had a goatee beard the day of Mr. Colunga–Salinas's murder.

(Ex. 36, p. 2). He also claimed to have recognized the freckles on Respondent's face, which he failed to mention in his previous statement. (*Id.*).

Applying the relevant factors, Mr. Perez–Loredo was able to: (1) observe the assailant twice the day of the murder: first, when the assailant parked the black truck and told Mr. Perez–Loredo "take care of my van," and second, when the assailant and his companion came back about two hours later and both of them stood outside of the pickup truck for about fifteen minutes; (2) see the assailant "well;" (3) provide a description of the assailant that is consistent with Respondent's height, (*see* Ex. 24); (4) appear confident of his photographic identification of Respondent as the person driving the black pickup truck that was left at the parking lot; and (5) identify Respondent's

photograph nine days after the shooting occurred.

After considering the relevant factors for each witness, the Court finds that each of the witness's statement is independently reliable for purposes of determining probable cause.[25] The Court further notes that any one of the three witnesses' identification of Respondent would generally be sufficient to establish probable cause. *See Escobedo*, 623 F.2d at 1102 (relying on deposition of victim identifying petitioner after being shown a single photograph of petitioner in upholding finding of probable cause); *see also Cervantes Valles*, 268 F.Supp.2d at 773 ("In the domestic law enforcement context, an ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally regarded as sufficient to supply probable cause.") (citing *Burbridge*, 252 F.3d at 778).

---

**25.** Respondent also argues that his case is like *Cervantes Valles*. According to Respondent, the *Cervantes Valles* court considered the type of identification process done by Mexican authorities and took that into account in deciding the weight of the evidence. He further argues that the identification process used in *Cervantes Valles* appeared to be the same identification process employed by Mexican law enforcement in the instant case. However, *Cervantes Valles* is easily distinguishable. In that case, the court ultimately held that Cervantes Valles had "totally negated and obliterated the probable cause evidence advanced on behalf of the Mexican government." *Id.* There was significant substantive evidence that indicated that the identifications were not just impermissibly suggestive, but were completely false. For example, Cervantes Valles offered testimony from an investigator for the Federal Public Defender's office confirming that the address for the gunman which appeared in the Mexican prosecution file was not his address. *Id.* at 768. Moreover, the investigator spoke to the owner of the home who confirmed he had a son named "Jose Oscar Cervantes Valle." *Id.* at 769. The court noted that all of the evidence adduced at the hearing indicated that the

owner of the home was not the same man as the one who credibly testified as Cervantes Valles's father at the hearing. *Id.* Respondent also offered documentary evidence from the Immigration and Naturalization Service ("INS"), including copies of photographs of "Jose Oscar Cervantes Valle." *Id.* at 770. The documents showed that "Jose Oscar Cervantes Valle" lived at the gunman's address, and he had been returned to Mexico by INS. *Id.* The court stated that this evidence made "clear that Respondent is not Jose Oscar Cervantes Valle (*i.e.*, the individual suspected to be the gunman in the killing of Guillermo Colorado Saavedra)." *Id.* According to the court, it was a "textbook case of mistaken identity" and it was "overwhelmingly convinced that ... [Cervantes Valles] is not the person sought by the Mexican government." *Id.* at 774–75. That is, the United States Government's own records related to the deportation of another person suggested that it was that person, and not Cervantes Valles, who was wanted by the Mexican authorities. *Id.* Thus, even if the court had not considered the unreliable identification evidence, there was sufficient evidence in that case to obliterate probable cause.

### 3. *Credibility of witnesses*

■ Respondent also questions the credibility of the witnesses that provided statements to Mexican law enforcement. However, as discussed above, "an accused in an extradition hearing has no right ... to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain,* 641 F.2d at 511; *see Austin v. Healey,* 5 F.3d 598, 605 (2d Cir.1993) (stating that respondent's challenge to "the reliability and credibility of the evidence is misdirected"); *In re Extradition of Mainero,* 990 F.Supp. 1208, 1218 (S.D.Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."); *United States v. Peterka,* 307 F.Supp.2d 1344, 1349 (M.D.Fla.2003) (at extradition hearing, "the court shall exclude evidence that is proffered to ... challenge the credibility of witnesses"); *Rodriguez Ortiz,* 444 F.Supp.2d at 891–93 (holding that the issue of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico"); *In re Extradition of Solis,* 402 F.Supp.2d 1128, 1131 (C.D.Cal.2005) (holding that respondent could not challenge the veracity or validity of a witness's statement because "a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country"). Here, a witness's lack of credibility may be a weakness in Mexico's case against Respondent, but it does not "completely obliterate" evidence of probable cause, and such evidence could be properly excluded. *See Garza,* 180 Fed.Appx. at 523 (holding that it was not erroneous for committing court to refuse to admit an affidavit from a private investigator that provided evidence of a witness's lack of credibility when "the affidavit would not have explained away the witness's testimony, but only challenged its credibility"); *see also Barapind v. Enomoto,* 400 F.3d 744, 749 (9th Cir. 2005) (affirming the determination that there was sufficient evidence to support the probable cause finding but recognizing that there is conflicting evidence and credibility determinations that will need to be resolved by a trial in the requesting country). However, if the Court chooses to entertain Respondent's credibility arguments, "the credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate [judge]." *Ntakirutimana,* 184 F.3d at 429 (citing *Quinn,* 783 F.2d at 815).

Here, Respondent questions the witness's credibility because their statements are either internally inconsistent or contradict statements made by other witnesses. Regarding Mr. Perez–Loredo, Respondent makes the following credibility arguments: (1) he did not see the shooting; (2) he can only potentially describe the driver of the vehicle; (3) his statement differs from everyone else's in that he says the truck arrived at approximately 11:30 a.m. and Mr. Villarreal–Lopez says the truck arrived at approximately 2:30 p.m.; (4) he describes the driver as having a dark green jacket and no facial hair while every other witness describes the "tall person" as having facial hair and wearing a white t-shirt; (5) he admits he never got close to either man; and (6) he purports to identify Respondent from a photo and said he recognized Respondent because of his freckles, but he failed to mention the freckles in his previous statement.

Regarding Mr. Villarreal–Lopez, Respondent makes the following credibility arguments: (1) he did not see the shooting; (2) he says nothing about who shot Mr. Colunga–Salinas in his statement given the day of the shooting, but then, in his

subsequent statement, he claims he did see the person who shot the victim because he saw the tall person standing behind the victim; and (3) in his initial statement he said both men ran out of the bar, and in his subsequent statement, he said that both men walked out of the bar.

Regarding Ms. Hernandez–Arizaga, Respondent makes the following credibility arguments: (1) because Ms. Hernandez–Arizaga claims that she ducked under the bar after the shooter shot Mr. Colunga–Salinas, anything she says after that is what she heard from other people; (2) even though she claims to have witnessed the shooting, she does not appear in the ministerial police's initial report; and (3) she told another waitress that a man with silver crowns in his teeth that had been at Las Botellas on Friday night, the night before the shooting, was the person who shot Mr. Colunga–Salinas and other witnesses claimed to have identified this man as the companion of the "tall man in the white t-shirt."

When analyzing all of the evidence provided in support of probable cause, including the witness statements, the Court must apply a "totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime." *Rodriguez Ortiz,* 444 F.Supp.2d at 884 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (internal quotations omitted). A totality of the circumstances analysis is not limited to compartmentalizing each statement and highlighting minor deficiencies in the statements. Rather, such an analysis requires a discussion of how the evidence provided is both consistent and inconsistent, and an examination of the evidence taken as a whole.

The Court notes that while there are inconsistencies between and within the witness statements, Respondent overstates the impact of many of these inconsistencies to the Court's probable cause determination. For example, whether Mr. Perez–Loredo and Mr. Villarreal–Lopez actually observed the shooting is immaterial because both place Respondent, and his truck, at or near the scene of the crime. Moreover, the fact that Mr. Villarreal–Lopez initially stated that he saw both men run out of the bar, and then stated that both men walked out of the bar does not make him an unreliable witness. In addition, Mr. Villarreal–Lopez did not state that the truck *arrived* at approximately 2:30 p.m., as asserted by Respondent. Rather, he stated that he saw the men standing outside of the pickup at that time. Therefore, while Mr. Perez–Loredo claimed to have initially seen the men arrive at the parking lot at approximately 11:30 a.m., he also claimed to have seen the men arrive a second time, which is not inconsistent with Ms. Hernandez–Arizaga's and Mr. Villarreal–Lopez's statement that the men arrived later in the afternoon. Respondent questions Ms. Hernandez–Arizaga's credibility, in part, because she ducked under the bar after the shooter shot Mr. Colunga–Salinas and anything she says after that is what she heard from other people. However, any facts relayed by Ms. Hernandez–Arizaga after she witnessed the shooting are of little to no significance to the probable cause determination.

Notably, "providing an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition." *Rodriguez Ortiz,* 444 F.Supp.2d at 891–93. In this matter, the witness statements enjoy several indicia of reliability. For example, each of the witnesses provides a similar description of the person they believe to be Mr. Colunga–Salinas's

shooter. Furthermore, the witness descriptions are not materially inconsistent with Respondent's age and height. (*See* Ex. 24). Both Mr. Villarreal–Lopez and Mr. Perez–Loredo indicated that they saw a black Dodge pickup truck parked at the parking lot across from Las Botellas, and it is undisputed that the truck belonged to Respondent. Moreover, Mr. Villarreal–Lopez and Ms. Hernandez–Arizaga's statements of what happened from the time the men walked into the bar to the time Mr. Colunga–Salinas was shot are very similar. The Court finds that the witnesses' statements, while subject to impeachment due to some inconsistencies, are sufficiently reliable to provide the requisite "any evidence" establishing probable cause to believe that Respondent committed the charged crime.

#### 4. *The Mexican government's failure to provide all potential evidence*

■ Respondent further argues that there were a number of other potential witnesses who were not interviewed or whose statements were not provided to this Court. A government need not produce all evidence necessary to ensure a conviction in order to obtain extradition. *Austin*, 5 F.3d at 605 (citing *Quinn*, 783 F.2d at 815). Rather, the evidence presented need only "support a reasonable belief that [Respondent] was guilty of the crime[ ] charged." *Id.* (internal quotations omitted). Thus, while Respondent identifies arguments that may help him at trial, he does not undermine the evidence establishing probable cause to believe that he is the person who killed the victim. *Salazar*, 2010 WL 2925444, at *11 (stating that the Mexican government's failure to interview potential witnesses or to provide the Court with all witness statements did not undermine the evidence establishing probable cause); *see also Garza*, 180 Fed.Appx. at 522 (upholding district court's finding of

probable cause even though there was no eyewitness identifying respondent as the shooter, but there was circumstantial evidence including that respondent had "quarreled with the victim and brandished a gun at him a few hours prior to the shooting" and that respondent was in Reynosa, Tamaulipas, Mexico the night of the murder).

#### E. Humanitarian Exception

■ Lastly, Respondent argues that there is case law supporting a humanitarian exception to international extradition. According to Respondent, if the Court finds that there is probable cause to extradite, it can decline to certify Respondent's extraditability in light of humanitarian considerations. In support of this argument, Respondent referred to two Ninth Circuit cases where the Ninth Circuit alluded to the possibility of a humanitarian exception to international extradition. *See Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999); *Emami*, 834 F.2d at 1453 (citing *Gallina v. Fraser*, 278 F.2d 77, 78 (2d Cir.1960)). While the Ninth Circuit has acknowledged citing to the possibility of a humanitarian exception, it specified that it has "never actually 'relied on it to create' such an exception." *See Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir.2005).

More importantly, the Fifth Circuit has expressly held that the "the degree of risk to [an extraditee's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch." *Escobedo*, 623 F.2d at 1107 (citations omitted); *see Diaz Medina*, 210 F.Supp.2d at 820 ("Humanitarian concerns are issues for the executive branch to determine."); *Nava Gonzalez*, 305 F.Supp.2d at 693 n. 26 ("The potentially life-threatening risks which Respondent may face as an ex-policeman in Mexico are properly addressed to the executive branch."). Similar to Re-

spondent's allegations, Escobedo argued that he may be tortured or killed if surrendered to Mexico, and asked the court to bar his extradition on humanitarian grounds.[26] *See Escobedo*, 623 F.2d at 1107. "Such issues may be urged upon the Secretary of State, to whom the certificate of extraditability is being issued," and who will ultimately determine whether Respondent will be surrendered. *Nava Gonzalez*, 305 F.Supp.2d at 693 n. 26; *see Garcia–Guillern*, 450 F.2d at 1192. Thus, the Court is simply "not permitted to inquire into the procedure which awaits [Respondent] upon his return." *Garcia–Guillern*, 450 F.2d at 1192.

### F. Respondent's "Motion not to Extradite to Mexico (Pro Se)"

Although Respondent has always been represented by counsel throughout these proceedings, he filed a motion *pro se.* (Dkt. No. 28). The exact relief sought by Respondent is unclear. Initially, he states that he is "filing this motion asking for a stay of extradition." (*See id.* at p. 1). Then, he indicates he is "asking for the protection of the United States under protection from extradition and double jeopardy federal law." (*Id.*). He concludes by renewing his request for a "stay of extradition on [his] behalf." (*Id.* at p. 4).

■ At the time of the filing of Respondent's motion, the Court had not yet made a determination of Respondent's extraditability. Thus, there was no extradition to stay. To the extent that Respondent is filing a motion to stay after a certificate of extraditability is issued to the Secretary of State, that is beyond the scope of the Court's duties for foreign extradition cases. Although it is the Court's responsibility to notify the Secretary of State that a certificate of extraditability has been issued, it is Respondent's obligation to notify the Secretary of State of his intention to file a writ of habeas corpus and request a stay of his extradition. *See Allen*, 713 F.2d at 110.

Respondent also provided information relevant to foreign extradition requests such as the requirement of a treaty and

---

**26.** The Court admitted Respondent's Exhibits 1–15 for the limited purpose of preserving any error on the humanitarian exception. The vast majority of the exhibits were newspaper articles discussing multiple incidents in Mexican prisons. (*See* Resp. Ex. 2, *Nuevo Laredo Prison Acting Warden Killed;* Resp. Ex. 3, *Nuevo Laredo Prison Warden Shanked to Death;* Resp. Ex. 4, *Mexican Female Warden Rebeca Nicasio Killed by Inmate in Nuevo Laredo Jail;* Resp. Ex. 5, *Nuevo Laredo Prison Director Killed;* Resp. Ex. 6, *Zeta Hitman Dies [in Nuevo Laredo, Mexico Prison];* Resp. Ex. 7, *Corrupt, Insecure Prisons Undermine Mexico Drug War;* Resp. Ex. 8, *FACTBOX–Incidents at Mexican Jails;* Resp. Ex. 9, *Breakout Latest Chapter in Prison's Sordid Story* ). He also submitted multiple documents discussing the general conditions in Mexico. (*See* Resp. Ex. 1, *Tamaulipas: In Eight Days, Nine Drug Executions;* Resp. Ex. 10, Travel Warning, U.S. Department of State, Bureau of Consular Affairs; Resp. Ex. 14, Recent Embassy Notices for American Citizens, Travel Warning for Mexico; Resp. Ex. 15, 2006 Country Reports on Human Rights Practices, Bureau of Democracy, Human Rights, and Labor). Respondent also provided a copy of his "Request for Modifying the Conditions or Term of Supervision with Consent of the Offender" in Case No. 5:01–cr–01359. (*See* Resp. Exs. 24, 25). These documents reflect Respondent's administrative discharge from a halfway house due to him "being a safety risk to staff personnel and inmates." Further, the documents demonstrate that Respondent informed the court modifying his conditions of supervision that his truck was driven by an acquaintance to Mexico and was used in connection with a murder. As a result, Respondent asserted, gang threats put him and his family at risk. Thus, the Bureau of Prisons determined that due to Respondent's "possible gang involvement and the threats he alleges," it was necessary to remove him from the halfway house for the protection of other residents and staff.

the necessity of submitting foreign extradition requests through diplomatic channels. (Dkt. No. 28, pp. 1–2). He claims that he has not "had the benefit of the justice departments intervening" and that "if this would happen it would certainly help [him] to receive justice." (*Id.* at p. 2). To the extent Respondent is claiming that the Mexican government's request was not submitted through proper diplomatic channels, his argument is without merit.

Respondent also claims to have been charged with the murder in Mexico and that after those charges were dropped, he was released. (*Id.* at p. 1). At the extradition hearing, however, his counsel made clear that the "prior arrest" Respondent was referring to was when DPS officers picked him up at his house and took him to the DPS office for questioning. Thus, he was never arrested in Mexico.

Furthermore, Respondent provides a case summary of *Valentine v. United States*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), which is "known in the study of international criminal law for its contribution to the concept that ... the United States ... will not extradite without authority found in statute or treaty." (*See* Dkt. No. 28, p. 3). Respondent "pray[s] for the United States Government use [*Valentine* ] to ask the court to honor [his] petition." (*Id.* at p. 4). To the extent that Respondent is arguing that a valid treaty is not in effect, his argument is without merit. As discussed above, Mr. Wierzynski's declaration verifies that the Treaty between the United States and Mexico was signed on May 4, 1978, and is presently in full force and effect.

## V. CONCLUSION

■ A review of the submitted, properly-authenticated declarations and statements reveals that there is probable cause to believe Respondent is the person who shot Mr. Colunga–Salinas at Las Botellas bar on January 8, 2005. Medical records were proffered showing that Mr. Colunga–Salinas was fatally wounded by a gunshot. The Government also proffered evidence including the statement of one eye-witness that identified Respondent as the person who committed the homicide and two eye-witnesses that placed Respondent at the scene of the crime. Furthermore, it is undisputed that the Dodge pickup truck found at the parking lot across Las Botellas bar was Respondent's truck. As such, the "Formal Extradition Request" (Dkt. No. 10) is **GRANTED,** and Respondent is hereby **CERTIFIED** as extraditable. Furthermore, Respondent's *pro se* motion (Dkt. No. 28) is **DENIED.**

### A. Certificate of Extraditability

Having determined that the evidence proffered by the United Mexican States is sufficient to sustain the charges to justify committal for trial in accordance with the laws of the United States, the extradition request should be **GRANTED.** The Court hereby **CERTIFIES** Heriberto Garcia extraditable to the Secretary of State of the United States of America. Heriberto Garcia shall remain in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the United Mexican States, or until further order from this Court or from the Secretary of State.

### B. Notice

The Court **DIRECTS** the Clerk of Court to deliver a copy of this Memorandum and Order, together with all formal extradition documents received into evidence, all evidence taken at the hearings and all memoranda of law filed on the issue of extradition, and all orders of court via certified mail (return receipt) to: U.S. Department of State, Secretary of State Hillary Rod-

ham Clinton, 2201 C Street NW, Washington, D.C. 20520.